FILED
United States Court of Appeals
Tenth Circuit

August 20, 2008

Elisabeth A. Shumaker
Clerk of Court

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

      Plaintiff-Appellee/Cross-
      Appellant,

v.

GLENN M. GALLANT,

      Defendant-Appellant/Cross-
      Appellee.

———————————————————

UNITED STATES OF AMERICA,

      Plaintiff-Appellee/Cross-
      Appellant,

v.

DOUGLAS R. BAETZ,

      Defendant-Appellant/Cross-
      Appellee.

———————————————————

UNITED STATES OF AMERICA,

      Plaintiff-Appellant/Cross-
      Appellee,

v.

THOMAS ALAN BOYD,

      Defendant-Appellee/Cross-
      Appellant.

———————————————————

Nos. 07-1344 & 07-1391

Nos. 07-1356 & 07-1392

Nos. 07-1407 & 07-1422

UNITED STATES OF AMERICA,

      Plaintiff-Appellant/Cross-Appellee,

v.

JACK O. GRACE, JR.,

      Defendant-Appellee/Cross-Appellant.

Nos. 07-1408 & 07-1423

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**(D.C. No. 03-CR-232-RPM)**

---

John M. Haried and James C. Murphy, Assistant United States Attorneys, (Troy A. Eid, United States Attorney; Michael P. Carey, Assistant United States Attorney, with them on the briefs), Denver, Colorado, for the Plaintiff-Appellee/Cross-Appellant, United States of America.

Sean Connelly, Reilly, Pozner & Connelly, LLP, Denver, Colorado (Jason M. Lynch, Reilly, Pozner & Connelly, LLP, Denver, Colorado; Patrick J. Burke, Patrick J. Burke, P.C., Denver, Colorado; Robert T. Fishman, Denver, Colorado, with him on the briefs),  for Defendants-Appellants/Cross-Appellees, Glenn M. Gallant and Douglas R. Baetz.

John T. Carlson, Assistant Federal Public Defender, (Raymond P. Moore, Federal Public Defender, with him on the briefs), for Defendant-Appellee/Cross-Appellant, Thomas Alan Boyd.

Daniel J. Sears, Daniel J. Sears, P.C., Denver, Colorado, for Defendant-Appellee/Cross-Appellant, Jack O. Grace, Jr.

---

Before **TACHA, BRISCOE,** and **LUCERO**, Circuit Judges.

---

2

**BRISCOE**, Circuit Judge.

---

Defendants Glenn Gallant, Douglas Baetz, Jack Grace, and Thomas Alan Boyd have filed these direct appeals after being convicted of a variety of fraud-related crimes arising from and related to the operation of a credit card portfolio financed by BestBank, a Colorado bank insured by the Federal Deposit Insurance Corporation ("FDIC"). Defendants Gallant and Baetz were tried before a jury and convicted of conspiracy, bank fraud, false bank reports, wire fraud, and a continuing financial crimes enterprise ("CFCE"). They now appeal those convictions, arguing that the evidence was legally insufficient to support their convictions and that the district court erred in failing to give a requested jury instruction. Defendants Grace and Boyd were convicted of similar counts in a separate bench trial, but do not appeal their convictions.

Due to the common legal and factual issues presented by these cases, the district court sentenced all four defendants using essentially the same procedures and enhancements. All four defendants appeal their sentences, arguing that the district court committed procedural error in calculating the applicable Guidelines range. The government has cross-appealed the sentences in all four cases, raising a number of challenges to the district court's calculation of the Guidelines range, the procedures used by the district court in conducting sentencing, and the district court's failure to order restitution.

Although not all of the issues raised are common to all four defendants, we are addressing all appeals in a single opinion because there is significant overlap between both the facts and the legal issues. We have jurisdiction pursuant to 28 U.S.C. § 1291 and 18 U.S.C. §§ 3742(a)-(b). We reverse the convictions of Gallant and Baetz on Counts 55 and 56 and affirm their convictions on all other counts, reverse the sentences of all four defendants, and remand to the district court with direction to vacate their sentences and resentence.

## I. FACTUAL BACKGROUND

In 1989, Edward Mattar purchased a state-chartered bank in Thornton, Colorado, which he renamed BestBank. Mattar reorganized the bank, changing it to a commercial state bank with deposits insured by the FDIC. Because Mattar had no banking experience, regulatory approval for his ownership of the bank was contingent upon his employment of experienced bankers to operate the bank. Accordingly, Mattar hired Thomas Alan Boyd to serve as President of BestBank and Jack Grace to serve as its Chief Financial Officer. Both Boyd and Grace had prior banking experience. Mattar served as Chief Executive Officer of BestBank, and as the sole shareholder, he appointed the Board of Directors. Along with Mattar, Boyd, and Grace, several other persons served on the Board of Directors.

One of the key components of BestBank's business plan was the issuance of VISA credit cards to sub-prime cardholders. Sub-prime cardholders do not qualify for credit cards from most lenders. Many have a bad credit history, or

4

have no credit history at all, and there is a high risk that they will not pay off the debt they accumulate on their credit card accounts. Given the increased probability that sub-prime cardholders will not pay off their debt, assessing interest on the debt is not always as profitable as charging front-end fees to applicants before issuing credit.

To market and operate its sub-prime credit card program, BestBank entered into a Marketing Agreement with Century Financial Services, Inc. ("Century") on February 22, 1994. Century was owned and operated by Douglas Baetz and Glenn Gallant, who were prior associates of Boyd.[1] Under the Marketing Agreement, BestBank established the underwriting criteria and provided the capital for the extension of credit to cardholders. In exchange for its investment, BestBank received six per cent interest above the cost of funds. BestBank also received a portion of the fees charged to the accounts. Century, in turn, performed most of the marketing and management of the credit card portfolio: soliciting credit card applications, issuing cards to applicants, and collecting fees and interest from cardholders. Century profited from the arrangement by collecting fees and other charges from cardholders.

BestBank and Century relied upon a "processor," First Data Resources

---

[1] Baetz and Gallant owned various other related entities involved in the marketing and servicing of the BestBank credit card portfolios. These entities included Century Financial Group, Bankcard Center, Columbia Capital Corporation, and Burwin Holdings. We will refer to these entities collectively as "Century."

5

("FDR"), to perform certain tasks for the credit card portfolio. As the processor, FDR monitored accounts, updated account information, collected payments from cardholders, mailed plastic credit cards to cardholders, handled all monetary transactions and postings to accounts, and produced and sent account statements and other reports regarding cardholder payments. In October 1997, Century changed its processor to First Independent Computers, Inc. ("FICI"), which Baetz and Gallant owned and operated. These processors created daily and monthly reports, which were the primary source of the data that the prosecution and its experts relied upon at trial.

In order to shield itself from potential losses, BestBank required Century to purchase from it any accounts that were over 120 days delinquent, including accounts that were uncollectible (or "charged off"). Later, in September 1996, BestBank and Century negotiated an addendum to the Marketing Agreement, requiring Century to purchase all accounts that were over sixty days delinquent. To finance Century's purchase of delinquent or uncollectible accounts, BestBank required Century to keep a bad debt reserve on hand in an account at BestBank. This bad debt reserve originally totaled four per cent of the portfolio, and was later increased to five per cent of the portfolio. BestBank also kept some control over Century's operating account, and Century occasionally needed BestBank's approval to withdraw money from the operating account. In 1996, Century and BestBank further agreed that Century would have a "participation," by which

6

Century would purchase additional non-performing accounts in the credit card portfolio. Despite these protections, BestBank had to absorb any additional losses out of BestBank's own bad debt reserve if delinquent or uncollectible accounts exceeded Century's ability to pay. If these losses, in turn, exceeded BestBank's ability to pay, then state and federal regulators would shut down the bank, and the FDIC would insure BestBank's depositors for up to $100,000 each—which, ultimately, is what happened.

The first joint BestBank/Century credit card venture under the Marketing Agreement began in 1994 with the issuance of secured credit cards. Under the secured credit card program, each applicant was required to open a non-interest-bearing account with BestBank with a minimum security deposit of $250. In exchange for this security deposit, the applicant received a credit card with a credit limit equal to the amount of the security deposit. The applicant was charged a $20 application fee and an annual fee of $129 (later reduced to $95), and the applicant was required to make minimum monthly payments of $20, with eighteen per cent interest charged on any outstanding balance.

Initially, the secured program appeared successful. Century opened a large number of new credit card accounts, using telemarketing to contact potential cardholders. However, all was not well. Although some of the reported accounts were valid, Century, under the direction of Baetz and Gallant, opened a number of accounts without receipt of the mandatory minimum $250 security deposit. In

many such cases, Century did not issue cards or account statements to the purported cardholders, thereby concealing the existence of the accounts from the purported cardholders themselves. Sometimes, Century reduced the credit limit on the accounts to zero, or charged the security deposit to the card. Century charged the $129 annual fee, as well as other fees and charges, to these accounts, causing BestBank to transfer funds for these amounts to Century's operating account and to record the amounts as receivables on BestBank's books. With the number of accounts steadily exceeding the number of cardholder payments, BestBank's receivables continued to grow.

As fraudulent accounts—as well as some valid accounts—became delinquent, Baetz and Gallant began disguising the delinquencies in order to avoid Century's obligation to purchase those accounts from BestBank. Frequently, Century simply "re-aged" accounts, removing their delinquency status and making them appear current without any payments by the cardholders. This re-aging violated the Marketing Agreement and seriously increased BestBank's exposure to risk by disguising a host of otherwise delinquent loans that had little chance of cardholder repayment. In other cases, Century charged the $129 annual fee to an account, while simultaneously crediting the same account for $129. Although these simultaneous debits and credits canceled each other out, their effect was the same as re-aging: they removed the delinquency status and made the accounts appear current.

8

Jon Wiedmaier, a BestBank employee who oversaw the secured program, became concerned in early 1995 about delinquencies in the portfolio. He noticed that many delinquent accounts had been re-aged, or had been subjected to simultaneous debits and credits for the annual fee. Wiedmaier also noticed that many accounts had balances greater than 151% of the credit limit. Many of these accounts had been charged annual fees, late fees, and interest, but they had never received a security deposit and their credit limit was zero. In many cases, cardholders were not receiving monthly statements or making payments, and re-aging had prevented the accounts from being reported delinquent. At one point, 18,000 accounts out of a total of 40,000 had been re-aged. This was a far cry from normal re-aging practices for a credit card portfolio. Typically, re-aging occurs in less than one per cent of accounts and only in situations where cardholders have made good-faith arrangements with the issuing bank to pay back an otherwise unaffordable credit card debt.

Wiedmaier concluded that someone had been concealing delinquent accounts. He continued investigating the problem, and he raised his concerns with Boyd and Grace in a memorandum dated January 27, 1995. He explained that forty-five per cent of the portfolio balance consisted of charges to accounts with balances greater than 151% of the credit limit. On the vast majority of these accounts, the balances consisted entirely of annual fees, late fees, and interest, and none of these accounts had security deposits. In addition, forty-two per cent

of the portfolio was in the first month of delinquency, a much higher percentage than normal.

In May 1995, Boyd and Grace communicated with Century about the problems with the portfolio. Boyd, writing to Baetz, directed Century to stop opening accounts without a completed application and security deposit, and to charge off all accounts over 120 days delinquent. In another letter, Boyd reminded Baetz that the Marketing Agreement prohibited Century from re-aging accounts without BestBank's permission. Boyd informed Baetz that unless the situation reversed itself, BestBank's bad debt reserve might not be adequate to cover losses.

Despite Boyd's correspondence, re-aging continued unabated. In a memorandum to Grace dated June 8, 1995—and copied to Boyd and Mattar—Wiedmaier attempted to quantify the problem. He explained that 4,900 accounts, with balances totaling $700,000, had $150 credit limits but no security deposit, and had balances consisting solely of annual fees, late fees, and interest. An additional 9,900 accounts, with balances totaling $1.3 million, had credit limits of zero, no security deposits, and no credit cards issued. Wiedmaier also discovered accounts where the cardholders had done nothing but post security deposits, as well as accounts where there were no security deposits but where annual fees had been debited from the cardholders' checking accounts. In total, he discovered 16,000 accounts, with balances totaling $2.2 million, which he

10

thought were uncollectible. In a letter dated June 1, 1995, Boyd warned Baetz of the problems with these accounts. Nevertheless, and in spite of Wiedmaier's protests, the accounts remained on BestBank's books.

Wiedmaier also attempted to develop a re-aging policy that would limit re-aging to the handful of situations in which it was appropriate. Wiedmaier reported his recommendations to Grace, Boyd, and Mattar, and Boyd informed Baetz and Gallant that they should not be re-aging accounts. The re-aging continued, however, and at some point, Boyd told Wiedmaier not to write or distribute memoranda that might cause problems with the FDIC. In August 1996, Wiedmaier was terminated with no explanation.

At the end of 1995, Century and BestBank brought an end to their foray into secured credit cards by selling approximately 20,000 performing accounts to BankFirst of South Dakota. Through the sale of the secured program, Century earned $1.9 million dollars, $1 million of which it paid to BestBank and $500,000 of which it devoted to setting up a bad debt reserve to cover any non-performing accounts that it had sold. The evidence at trial did not show whether BestBank sustained a loss from the secured credit card program.

In May 1996, Century and BestBank embarked on a new credit card venture. Under the new program, applicants for a BestBank credit card were still charged a $20 application fee, but unlike the previous program, the accounts were unsecured. Like the secured program, the unsecured program relied primarily on

11

telemarketing, and BestBank established the underwriting criteria for each new applicant. Each card had a credit limit of $600, but in order to receive a card, an applicant automatically incurred a one-time charge of $498. This charge gave the cardholder a membership in the All Around Travel Club ("AATC")—a venture in which Gallant and Baetz owned a 52% interest—and entitled the cardholder to various travel discounts and a voucher for a free cruise.[2] Of the $498 membership fee, AATC received $100 and Century kept the balance.

In addition to the $498 membership fee, recipients of the unsecured cards were charged an annual fee of $45. The $498 membership fee and $45 annual fee were charged to each new account within a day or two of the account being opened. Each new account therefore carried an automatic balance of $543, and had only $57 of available credit. Some of this $543 was deposited by BestBank into Century's or BestBank's bad debt reserve, or into Century's participation account. Most of the $543, though, was quickly deposited by BestBank into Century's operating account, and all of the $543 was recorded as a receivable on BestBank's books, thereby inflating the value of BestBank's assets. Some valid accounts were opened under the AATC program, but Century opened many of the accounts and received the $543 in fees without first receiving signed applications or $20 application fees. Sometimes, Century even posted additional charges to

---

[2] For a brief time during late 1995 and early 1996, Century marketed a similar unsecured credit card program involving Universal Tours, but it was replaced by the AATC program after only a few months.

accounts that had never received payments. As with the secured program, Century concealed the existence of some accounts by not issuing plastic cards or sending account statements to the purported cardholders. For instance, as of September 1997, Century had failed to issue a plastic credit card for 179,000 of 224,000 accounts. Many of the account statements were shredded rather than sent to cardholders.

In addition, Baetz and Gallant did not purchase nearly enough travel vouchers for AATC to provide free cruises to all new cardholders, and many of the new AATC members never received their travel packages. Under an agreement with the vendor of the travel vouchers, AATC purchased 1,000 vouchers per week while Century was simultaneously opening between 8,000 and 10,000 new accounts per week. Because of this disparity, over 340,000 customers ultimately did not receive travel packages, despite the $498 membership fee that had been charged to each of their accounts. Some of these customers called to complain about not receiving their travel packages. AATC and Century continued selling new memberships and opening new accounts, even as the backlog of undelivered travel packages grew rapidly.

The number of delinquencies in the unsecured credit card portfolio rose swiftly. In September 1997, BestBank received only 25,000 cardholder payments on 225,000 open accounts. As of March 31, 1998, 307,000 out of 343,000 accounts were delinquent, over their credit limit, or had block codes preventing

13

the cardholders from using the accounts.

As delinquencies rose, Century disguised them in order to avoid its obligation to purchase delinquent and uncollectible accounts. Beginning in August 1996, Century began posting $20 credits to delinquent accounts at the direction of Baetz and Gallant. This caused the accounts to appear current. All incoming transactions on the FDR system had a particular transaction code identifying the type of transaction. The $20 credits were initially applied using the FDR transaction code 255, which was normally reserved only for the return of merchandise to a merchant. When the portfolio processor changed to FICI—which had different software than FDR—the credits were posted using transaction codes 22 and 21, both of which were normally reserved for cardholder payments.

Century initially paid BestBank for the $20 credits through withdrawals directly from Century's operating account. In March 1998, however, Century began transferring the money for these credits to BestBank through an elaborate system of wire transfers. Century would first wire the money from its operating account at BestBank to another Century account at Farmers and Merchants Bank in South Carolina, after which it would wire the money to a BestBank account at State Security Bank in Abilene, Texas. There, the money was co-mingled with legitimate cardholder payments and sent to BestBank, the end result of which was to hide the fact that the $20 credits were being paid by Century rather than actual

14

cardholders.

Although the effect of these $20 credits was to transfer money from Century to BestBank, these payments were far below what Century should have paid if it had refunded the entire $498 AATC membership fee and $45 annual fee to BestBank for each account. The application of the $20 credits disguised the true risk of the portfolio, making it very difficult for anyone to determine whether cardholders on these accounts would ever submit payment. Several BestBank employees eventually became aware of the credits, including Boyd, Grace, Mattar, and John Schmalzer (the risk manager at BestBank).

Century applied the $20 credits up until July 23, 1998, the day the FDIC shut down BestBank. Over time, the number of $20 credits increased, eventually reaching almost 10,000 credits per day. In 1998 alone, in the seven months before BestBank's closure, Century posted $23,723,603 in credits. Several witnesses asserted at trial that the $20 credits were applied to accounts only because the cardholders had not yet received their travel packages from AATC. Witnesses also testified, however, that accounts were designated to receive credits depending upon whether the accounts were about to become delinquent. In addition, the credit limit on each account was reduced by the amount of the $20 credit, and if a cardholder made a payment after receiving a credit, the credit was reversed and the account was re-billed the $20. When asked about the credits, Baetz falsely informed one witness that they were cardholder payments sent

15

electronically.

Century also disguised delinquencies by posting "paid ahead" notations on accounts. The "paid ahead" mechanism is usually reserved for situations in which a cardholder is going on vacation, and in those instances, it requires the cardholder to have made a payment exceeding the previous balance. Century, however, posted the "paid ahead" notations on accounts that had never received any payments from the cardholders. The result was that no payments became due on the accounts during the "paid ahead" time period, and the accounts did not become delinquent.[3]

Ultimately, a total of 583,727 AATC accounts were opened, resulting in $316,963,005 in $543 charges alone.[4] Of these 583,727 accounts, Century either purchased or charged off 75,910 accounts after determining them to be uncollectible. More significantly, of the 583,727 accounts, 243,110 accounts (forty-two per cent of the total) received only AATC credits; 166,097 accounts (twenty-eight per cent) received a combination of cardholder payments and AATC credits; 103,846 accounts (eighteen per cent) received only cardholder payments;

---

[3] There was some conflicting testimony at trial regarding whether the "paid ahead" notation was added to new accounts because the cardholders were promised a sixty-day grace period. The cardholder agreement did not include a "paid ahead" grace period for new cardholders, however, and at least one witness testified that there was no such grace period.

[4] The total dollar value of these $543 charges is not $543 multiplied by 583,727, because there were sometimes errors in charges to the accounts—e.g., sometimes the $45 annual fee was charged twice.

16

and 70,674 accounts (twelve per cent)—mostly opened in the three months before BestBank closed—received neither credits nor cardholder payments. Between Century's purchases of accounts, participation, and bad debt reserve, Century had the ability to cover approximately 161,545 accounts, a far cry from the 409,207 accounts that received credits to disguise their delinquency. In the end, 2,231,938 credits were posted to accounts, totaling $49,587,580.[5] For every month after October 1996, the number of credits exceeded the number of cardholder payments. In June 1998, for example, 235,195 credits were posted to accounts, while only 96,184 accounts received cardholder payments. By the time BestBank closed in July 1998, the dollar value of all delinquent accounts, including accounts that had received credits to disguise their delinquency, totaled $129,607,428—almost one-half of the AATC portfolio's $261,495,049 balance.

In January 1998, Joseph Bour, a BestBank employee and former Colorado bank examiner, discovered that Century was posting the $20 credits to accounts.[6] Fearing that BestBank might be exposed to losses totaling $50 million, Bour reported his concerns to Boyd, who responded that the Century relationship was very important to BestBank and that Bour needed to be careful about how he

[5] The total dollar value of the credits is not $20 multiplied by 2,231,938, because some of the credits were posted in multiples of $20—e.g., $40 or $60.

[6] The district court found beyond a reasonable doubt that following this discovery, the BestBank defendants (Mattar, Boyd, and Grace) had knowledge of the ongoing fraud and actively conspired with the Century defendants (Baetz and Gallant).

17

approached things.  Boyd also told Bour that the credits were actually payments made by cardholders via Western Union.  Ultimately, Bour communicated his concerns to Mattar, Schmalzer, and Grace (in addition to Boyd), and when he became convinced that they would not stop or remedy the problem, he promptly resigned and contacted the Colorado Division of Banking.

By this time, Colorado regulatory officials and the FDIC had begun to question BestBank's business practices.  Fearful that the regulators would learn that BestBank's assets were grossly overstated, Mattar, Boyd, and Grace undertook to save the bank from closure by further concealing Century's fraud.  They did this in part by accepting the continued $20 credits without question.  When the regulators raised questions about the value of the credit card program, Mattar, Boyd, and Grace actively misled the regulators, lying about the program's performance, the controls that had been put in place to ensure accuracy, and Century's ability to indemnify BestBank for non-performing accounts.  Enabled by Mattar, Boyd, and Grace, Century continued to open fraudulent accounts.  As a result of the artificial growth in BestBank's portfolio, moreover, Mattar and Boyd each received quarterly bonus payments totaling $6.9 million.  Grace received bonus payments totaling over $100,000.[7]

---

[7] Included in this calculation are bonus payments of $2,427,828 that Mattar and Boyd each received on January 22, 1998, and $2,316,081 that they each received on April 23, 1998.  Grace received bonus payments of $25,000 in January 1998, and $92,643 on April 30, 1998.

With BestBank's capital steadily declining, Mattar and Boyd made several attempts to sell BestBank. In the fall of 1997, they attempted to sell Mattar's ownership interest in the bank to South Dakota banker Frank Farrar. Their asking price was $10.1 million, $8,333,000 of which Farrar would contribute in exchange for fifty per cent of BestBank's stock, with Boyd owning the rest and continuing to operate the bank.

Farrar performed extensive due diligence in evaluating the purchase. He received a spreadsheet from BestBank, which listed total delinquencies as $12 million as of September 1997. In reality, delinquencies totaled over $53 million. Farrar later received Century's financial statements from Boyd. One set of financial statements omitted $35 million of delinquent accounts that Century was responsible for purchasing. These statements also omitted $6 million in $20 credits that Century had paid to BestBank over a six-month time period. Another set of financial statements claimed that shareholder equity in Century was almost $20 million, yet failed to mention that over $19 million of this amount consisted of delinquent AATC accounts worth only a fraction of their book value. In December 1997, Farrar traveled to Florida and met with Baetz and Gallant. Baetz and Gallant were generally cooperative in answering Farrar's questions, but never disclosed the problems they were having with the travel packages or the $20 credits that they were applying to delinquent accounts. Ultimately, Farrar chose not to purchase BestBank.

19

In April 1998, Mattar and Boyd attempted to sell a sixty per cent controlling interest in BestBank to Cerberus Partners for $23 million. Cerberus also conducted due diligence on BestBank. In doing so, it attempted to focus on the number of delinquencies and cardholder payments, as well as on Century's indemnification performance. Cerberus did not receive all of the information it requested regarding these subjects. When Cerberus did receive some of the information, moreover, Grace misstated the number of delinquencies, claiming there were $9.8 million of delinquencies as of December 31, 1997, and $8.5 million of delinquencies as of March 31, 1998—when in fact there were $62.5 million as of December 31, 1997, and $86.8 million as of March 31, 1998.

Cerberus representative Ronald Goldstein traveled to Florida to meet with Baetz and Gallant. Neither Baetz nor Gallant disclosed any problems with cardholder payments or the $20 credits that they were applying to accounts. Although Baetz and Gallant showed Goldstein the AATC travel packages, they did not disclose the problems with sending travel packages to cardholders. In July 1998, after learning that the FDIC was investigating BestBank, Cerberus lost interest in purchasing the bank's stock.

At the same time BestBank was attempting to sell its own stock to Cerberus, Baetz and Gallant hired David Taffet to sell the BestBank credit card portfolio—including Century's participation in that portfolio. Taffet attempted to market the $200 million pool of credit card receivables in the AATC portfolio and

20

to identify potential purchasers, such as large institutional investors. Baetz and Gallant agreed that Century would pay two per cent of the sale price to Taffet. They also agreed to provide him with all the information he needed to market the portfolio.

To sell the portfolio, Taffet began to put together a "book" to present to potential purchasers, explaining the details of the portfolio. He attempted to gather information from Baetz and Boyd, asking them for details on delinquency rates and loan losses. He also requested the "master tape" detailing all transactions, as well as the underwriting criteria for the credit cards and any call reports filed with the FDIC. He never received the "master tape." BestBank informed him that 97.3% of the portfolio was current, and that only 2.7% was delinquent. When Taffet asked Baetz and Gallant how delinquencies could be so low for a sub-prime credit card portfolio, Baetz claimed this was due to Century's superior collection efforts. Baetz also told Taffet that the FDIC evaluations of BestBank had gone well, that the AATC program was running smoothly, and that AATC cardholders were receiving their travel packages. Based on this information, Taffet concluded that the credit card portfolio had no delinquency risk, and he attempted to sell the portfolio at a premium above the $200 million book value.

When BestBank ultimately closed in July 1998, most potential purchasers immediately lost interest in the portfolio. Taffet concluded that Baetz and Gallant

21

had provided him with inaccurate information and confronted them in August 1998. Taffet told them that he believed delinquencies were actually much higher than they had reported, and that they were using credits and re-aging to disguise the true performance of the portfolio. Baetz admitted to making the credits, and he claimed that they were for dissatisfied AATC customers—which contradicted his previous assertions that the AATC program was running smoothly. Baetz then admitted to Taffet that the portfolio was, in reality, worth only about thirty per cent of its $200 million book value.

Following an inspection of BestBank in June 1998, regulators concluded in July 1998 that BestBank was insolvent. On July 22, 1998, the Colorado Division of Banking ordered an immediate infusion of new capital in the amount of $151,515,000. When BestBank failed to meet this capital call, the State of Colorado closed BestBank on July 23, 1998. The FDIC was appointed receiver. At the time, Century had approximately $8 million in its bad debt reserve, $46 million in its participation account, and $4 million in its operating account, while BestBank had approximately $3 million in its bad debt reserve—for a total of $61 million. The FDIC refused to release money from any of these accounts.

At trial, several counts against the defendants involved call reports submitted by BestBank to the FDIC. As an FDIC-insured bank, BestBank was required to file quarterly call reports with the FDIC, listing loan delinquencies

22

and reporting the amount of money set aside as a bad debt reserve.[8]  The

instructions for filing the call reports are publicly available on the FDIC's

website.  Bank officials usually prepare call reports from the bank's records, and

an officer and two directors must sign and certify each call report.

In a call report filed on June 30, 1995, BestBank stated that 412,000

accounts were 30-89 days delinquent, and 116,000 accounts were 90 or more days

delinquent.  To cover potential losses from these loans, BestBank stated in the

call report that it had set aside a bad debt reserve of approximately $340,000.

However, starting with the call report filed in September 1996, and continuing for

all call reports filed through July 1998, BestBank reported that its credit card

portfolio had zero delinquencies.  The lack of reported delinquencies

corresponded with a much smaller bad debt reserve than BestBank would

otherwise have been required to report.[9]  This, in turn, provided BestBank with

more net income than if its bad debt expenses had been higher.

Charles Wolfschlag, the cashier and a director of BestBank, testified that

the information provided to BestBank's Board of Directors indicated that the

---

[8] The FDIC also required call reports to include, *inter alia*, a balance sheet, an income statement, and a schedule distinguishing non-performing loans from performing loans.

[9] BestBank was permitted to consider Century's indemnification and participation obligations in calculating the numbers reported on the call reports, but only if Century had the financial capacity to—and actually did—honor those obligations.

23

credit card portfolio had no delinquencies after September 1996.[10] He explained that the Board approved BestBank's bad debt reserve based, in large part, on this information. Wolfschlag testified that he had never seen Wiedmaier's memorandum detailing problems with the secured portfolio, and if he had seen it, he never would have signed the call report that BestBank submitted on June 30, 1995. Wolfschlag also testified that the Board never approved simultaneous crediting and debiting of the annual fees on accounts in the secured portfolio, nor did the Board approve $20 credits or "paid ahead" notations on accounts in the unsecured portfolio. He stated that he never would have signed the call reports if he had known about the credits.

Baetz and Gallant knew of BestBank's obligation to file call reports and to submit to FDIC inspections, and on one occasion, Grace sent them a memorandum asking for their assistance in making BestBank appear solvent. On another occasion, in the spring of 1998, Baetz told Robert Kane, who was marketing vacation packages for AATC, that payments to Kane were being delayed because BestBank needed to bolster its cash position during an FDIC

---

[10] As cashier, Wolfschlag dealt mostly with the operations side of BestBank, and he had very little to do with the credit card program, which was supervised primarily by Boyd and Grace. His involvement with the credit card portfolio resulted from his position as a director, and in making decisions in that capacity, he relied upon information presented to him by Boyd, Grace, and Mattar. Wolfschlag was himself caught off-guard by BestBank's insolvency in July 1998, losing $60,000 in deposits that exceeded the $100,000 insured by the FDIC.

24

examination.

During the 24 months preceding BestBank's closure, Century deposited a total of $11.7 million into Gallant's personal bank account. Of this $11.7 million, $6.4 million was deposited from payroll, and $5.3 million consisted of other payments. During the same time period, Century deposited $11.6 million into Baetz's personal bank account. Of this $11.6 million, $6.5 million was deposited from payroll, and $5.1 million consisted of other payments.

## II.    PROCEDURAL BACKGROUND

In 2003, a federal grand jury returned a ninety-five count indictment naming Baetz, Gallant, Boyd, Grace, and Mattar as defendants. It included charges of conspiracy, bank fraud, accepting a commission or gift in exchange for procuring loans, filing false bank reports, wire fraud, participating in a CFCE, money laundering, securities fraud, tax evasion, and failing to file a tax return. The defendants requested separate trials pursuant to Federal Rule of Criminal Procedure 14(a). As the tax allegations applied only to Mattar, the government agreed to his request to sever those counts, and the district court ultimately granted that severance request. The government otherwise opposed severance, but the district court ordered two separate trials, one for Century defendants Gallant and Baetz, and one for BestBank defendants Mattar, Boyd, and Grace, based on the possibility of mutually antagonistic defenses between those groups of defendants.

The trial of the Century defendants was held first. At the close of the government's case, the court dismissed several of the wire fraud counts, all of the money laundering counts, and the count of receiving a commission in exchange for procuring a loan. A jury ultimately returned guilty verdicts for filing false bank reports, wire fraud, conspiracy, participating in a CFCE, and most of the bank fraud counts. Baetz and Gallant each moved for a judgment of acquittal on several counts of conviction, and the district court ultimately dismissed several of the bank fraud convictions.

The Century defendants then proceeded to sentencing. The government first filed a statement regarding sentencing, which outlined its view as to the applicable enhancements for Baetz and Gallant. It also called for restitution and forfeiture. A parole officer then prepared Presentence Investigation Reports ("PSRs") for the Century defendants, which calculated a total offense level of 34 and a criminal history of I for both men. This resulted in a recommended Guidelines range of 151-188 months' imprisonment. The PSRs also called for a total of $309,476,381 in restitution, and recommended an additional 3-level upward departure based upon the extent of loss created by the defendants. This additional enhancement would result in a Guidelines range of 210-262 months. The government also filed a motion for orders of forfeiture against Baetz for $11,604,179 and Gallant for $11,747,091. The district court denied this motion, but did "not foreclose the possibility of a further hearing to determine an

26

appropriate amount as part of the sentencing process." App'x Vol. II at 594.

The government and the defendants filed objections to the PSRs. While the parole officer reviewed those objections, the court, expressing concern regarding the effect of United States v. Booker, 543 U.S. 220 (2005), on its ability to calculate loss under the Federal Sentencing Guidelines, asked the parties to submit briefs addressing that issue. After reviewing the briefing of the parties, the district court elected to delay sentencing until after the completion of the BestBank defendants' trial. The court determined that evidence presented in the BestBank trial might impact the calculation of the amount of loss associated with the Century defendants. It also expressed a belief that delay would be more efficient because of the significant overlap between the sentencing issues involving the two sets of defendants.

The court then held the trial of the BestBank defendants. The case began as a jury trial, but the defendants agreed to proceed with a bench trial after one of the defendants' attorneys fell ill, interrupting the trial. At the close of trial, the court issued its findings pursuant to Federal Rule of Criminal Procedure 23(c). It acquitted the BestBank defendants of securities fraud, money laundering, receiving a gift in exchange for procuring a loan, and participating in a CFCE, but found them guilty of conspiracy and several of the counts of bank fraud, filing false bank reports, and wire fraud.

On the same day the district court issued its Rule 23(c) findings, it ordered

27

a hearing to resolve the procedures for sentencing the five defendants. At that hearing, the court expressed the view that the nature of the underlying offenses made the usual procedure of having a parole officer calculate the offense level as part of a PSR inefficient. This led the court to depart from the procedures outlined in Federal Rule of Criminal Procedure 32. It asked the government to submit a brief defining its position on how each defendant should be sentenced in order to have the government's positions with respect to all five defendants in a single document. The court stated that it would then allow each of the defendants to respond to any objectionable aspects of that brief.[11]

The most contentious point in the briefing was related to the calculation of the amount of loss caused by the defendants' conduct under section 2F1.1 of the Guidelines. The government presented the court with three possible approaches to calculating loss for the bank fraud counts, which varied between $206,775,813 and $141,402,151 for Gallant and Baetz and $65,156,797 and $42,599,862 for Boyd and Grace. For the wire fraud counts, the government argued that the measure of loss should be intended, rather than actual, loss. It calculated the intended loss at more than $140,000,000 for the attempt to sell the AATC credit card portfolio, which only applied to the Century defendants. It also calculated for both sets of defendants $23,000,000 in intended loss for the scheme to sell

---

[11] Although Mattar was tried and convicted in the same trial as Boyd and Grace, he was ultimately never sentenced, as he died on the day he was to be sentenced. There are therefore no issues regarding Mattar before this court.

28

BestBank stock to Cerberus Partners, and $8,300,000 for the attempt to sell BestBank stock to Farrar.

The government also sought restitution pursuant to the Mandatory Victims Restitution Act. See 18 U.S.C. § 3663A. It called for restitution divided between the five defendants to each victim in the full amount of each victim's loss, which included $206,775,813 to the FDIC and $1,360,239 to Cerberus. The government also argued that Gallant and Baetz separately owed restitution to David Taffet in the amount of $12,500. The government requested forfeiture from each defendant equal to the money paid as salary, bonus payments, and advances from the time when each defendant became aware of the scheme and calculated this amount at $11,604,179 for Baetz, $11,747,091 for Gallant, $4,743,909 for Boyd, and $92,643 for Grace.

The government sought additional base level enhancements for each of the defendants. It requested a two-level enhancement for all four defendants' involvement in a fraud that involved more than minimal planning. See U.S.S.G. § 2F1.1(b)(2). It also sought a four-level leader/organizer enhancement against Baetz, Gallant, and Boyd for their roles in the criminal enterprise, and a three-level manager/supervisor enhancement against Grace. The government also sought a four-level enhancement against all four defendants for committing a fraud that jeopardized the safety or soundness of a financial institution. See U.S.S.G. § 2F1.1(b)(6). Finally, the government requested a two-level

29

enhancement for the BestBank defendants for abusing positions of trust. See U.S.S.G. § 3B1.3.

Following briefing on these issues, the district court issued an order confirming that it would depart from the procedures outlined in Rule 32 and instead calculate the applicable Guidelines range itself. The court also stated that it would make its determination "considering only the respective trial records." App'x at 952. The government objected, arguing that the trial records alone would "not provide the Court with an accurate measure of harm resulting from the commission of the offenses" with respect to the calculation of loss under U.S.S.G. § 2F1.1 or in determining restitution mandated by 18 U.S.C. § 3663A. App'x at 953. The government requested an evidentiary hearing with respect to loss, arguing that "[w]hile the quantification of the loss for guideline purposes and restitution are issues inextricably linked to the evidence that was presented at trial, the evidence as to guilt is not coextensive with the proof of the amount of loss and the amount of harm to be compensated in an order for restitution." Id. at 953-54. The defendants argued that the court could not receive new evidence based on the Sixth Amendment.

The court held a hearing addressing the government's objection and determined that it would issue a preliminary Guidelines calculation that would address the issues of loss, restitution, and forfeiture based solely on evidence in the trial record. It determined that it would allow the parties to submit objections

30

to that calculation in which they could provide an offer of proof and request an evidentiary hearing.

The court subsequently issued its calculation of the Guidelines range. It agreed with the defendants regarding section 2F1.1, finding that "[t]he amount of losses caused by the defendants cannot be calculated by any formula that fairly considers their individual roles in the offenses and the intervention by the bank regulators and the FDIC as receiver." App'x at 979. The court elected to measure loss under section 2F1.1(b) based on what each defendant gained as a result of the criminal enterprise. The court found that Baetz received $11,604,179 from the scheme, while Gallant gained $11,747,091. These amounts triggered a fifteen-level increase for both defendants that enhanced their offense levels from 6 to 21. The court also found that Boyd received $4,743,909, which increased his offense level from 6 to 19, and that Grace received $117,643, increasing his offense level from 6 to 12.

The court then proposed a two-level enhancement against all of the defendants for their involvement in a criminal enterprise that involved more than minimal planning, as well as four-level enhancements for committing a crime that substantially jeopardized the safety and soundness of a financial institution. The court also proposed a four-level leader/organizer enhancement against Baetz, Gallant, and Boyd and a three-level manager/supervisor enhancement against Grace. The court did not recommend an enhancement against the BestBank

31

defendants for abusing a position of trust, however, because the "adjustment may not be employed if an abuse of trust is included in the determination of other specific offense characteristics and that is the case here where § 3B1.1(a) has been employed because of the positions held by these bank officers." Grace App'x Vol. IV, Doc. 1153 at 9.

The district court ultimately calculated an adjusted offense level of 31 for both Baetz and Gallant, which, when coupled with a criminal history of I, carried a Guidelines range of 108-135 months. The district court also calculated an adjusted offense level of 29 and a criminal history of I for Boyd, which called for a Guidelines range of 87-108 months. Finally, it calculated an offense level of 27 for Grace, which given his criminal history of I resulted in a Guidelines range of 70-87 months. The district court determined that it would not provide restitution to any of the four victims identified by the government. It did, however, impose forfeiture against each of the defendants "in the form of money judgments in the same amounts as the computation of the amount of loss attributed to each defendant in the calculation of the specific offense levels applicable to each." Grace App'x Vol. IV at 986.

The parties then submitted their objections to the district court's calculations. Baetz and Gallant objected to the imposition of a leader/organizer enhancement and the imposition of forfeiture. Boyd and Grace both objected to the imposition of enhancements for jeopardizing the soundness of a financial

32

institution, as well as their enhancements for their roles in the offense. Grace also claimed that the enhancement for committing an offense involving more than minimal planning was erroneous. Both BestBank defendants also submitted briefs arguing that permitting the government to offer additional proof of the amount of loss would violate the Sixth Amendment. The government objected to the district court's calculation of loss and the decision not to order restitution. The government also made an offer of proof regarding the basis of its proposed calculation of loss caused by BestBank's failure.

At the Century defendants' sentencing hearing, the district court rejected all objections, and imposed within-Guidelines sentences of 120 months for Baetz and Gallant, which represented the mandatory minimum sentence for the CFCE conviction. The court also imposed fines of $18,600 against each defendant, and ordered forfeiture against Baetz for $11,604,179 and Gallant for $11,747,091. The district court also rejected all objections made during sentencing of the BestBank defendants. It imposed within-Guidelines sentences of 90 months for Boyd and 72 months for Grace, imposed fines of $16,500 against each defendant, and ordered forfeiture of $4,743,909 against Boyd and $92,643 against Grace.

## III. CHALLENGES TO GALLANT'S & BAETZ'S CONVICTIONS

### A. *Sufficiency of the Evidence*

The evidence was sufficient to support the convictions of Baetz and Gallant, except with regard to Counts 55 and 56. "'Evidence is sufficient to

33

support a conviction if a reasonable jury could find the defendant guilty beyond a reasonable doubt, given the direct and circumstantial evidence, along with reasonable inferences therefrom, taken in a light most favorable to the government.'" United States v. Nelson, 383 F.3d 1227, 1229 (10th Cir. 2004) (quoting United States v. Wilson, 107 F.3d 774, 778 (10th Cir. 1997)). "We will not weigh conflicting evidence or second-guess the fact-finding decisions of the jury." United States v. Summers, 414 F.3d 1287, 1293 (10th Cir. 2005). "Rather than examining the evidence in 'bits and pieces,' we evaluate the sufficiency of the evidence by 'considering the collective inferences to be drawn from the evidence as a whole.'" Nelson, 383 F.3d at 1229 (quoting Wilson, 107 F.3d at 778).

Our court follows the "waiver rule," which requires "a defendant who moved for a judgment of acquittal at the close of the government's case [to] move again for a judgment of acquittal at the close of the entire case if he thereafter introduces evidence in his defense." United States v. Flanders, 491 F.3d 1197, 1207-08 (10th Cir. 2007) (citations and internal quotation marks omitted). Under this rule, we review for plain error where a defendant appeals the sufficiency of the evidence based upon an argument that he failed to make or reaffirm before the district court. Id. at 1208. Our plain error analysis in this context, however, is "essentially the same" as our usual sufficiency-of-the-evidence analysis. Id.

1.    Bank Fraud (Counts 32-44): Whether BestBank's alleged

34

<u>"knowledge" of the fraud mandates reversal</u>[12]

Baetz and Gallant first argue that we should reverse their convictions for bank fraud because the government introduced no evidence that they concealed, or attempted to conceal, the fraud from BestBank. They contend that BestBank was aware of the credits and re-aging practices and, as a result, they cannot be guilty under 18 U.S.C. § 1344(1) of defrauding BestBank.

The evidence was sufficient to support the convictions of Baetz and Gallant for bank fraud, and the participation of several BestBank directors and officers in the fraud does not negate Baetz and Gallant's culpability under 18 U.S.C. § 1344(1). The statute provides:

> Whoever knowingly executes, or attempts to execute, a scheme or artifice—
>
>     (1) to defraud a financial institution; . . .
>
> shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both.

18 U.S.C. § 1344(1). "Under 18 U.S.C. § 1344(1), the government must prove that: (1) the defendant knowingly executed or attempted to execute a scheme or artifice to defraud a financial institution; (2) the defendant had the intent to defraud a financial institution; and (3) the bank involved was federally insured."

---

[12] Baetz and Gallant appear to argue, in passing, that this "knowledge" also negates their convictions for conspiracy, false call reports, and CFCE. The substance of their argument deals entirely with the bank fraud counts, however, and they never address its application to conspiracy, false call reports, or CFCE.

Flanders, 491 F.3d at 1212. "The phrase 'scheme or artifice to defraud' simply requires a design, plan, or ingenious contrivance or device to defraud." Id. (quoting United States v. Hill, 197 F.3d 436, 444 (10th Cir. 1999)) (alteration and some quotation marks omitted). Under § 1344, "the intent necessary for a bank fraud conviction is an intent to deceive the bank in order to obtain from it money or other property." United States v. Kenrick, 221 F.3d 19, 26-27 (1st Cir. 2000) (en banc). "Section 1344 was intended to reach a wide range of fraudulent activity that undermines the integrity of the federal banking system," and "courts have liberally construed the statute." Flanders, 491 F.3d at 1212 (citation and internal quotation marks omitted). "The broad range of schemes covered by the statute is limited only by a criminal's creativity." United States v. Norton, 108 F.3d 133, 135 (7th Cir. 1997).

Baetz and Gallant appear to argue that because their conduct was not concealed from BestBank, the evidence was insufficient to show either "a scheme or artifice to defraud" or "intent to defraud" under § 1344. In United States v. Rackley, 986 F.2d 1357, 1361 (10th Cir. 1993), we rejected a similar argument, explaining:

> Defendant confuses the notion of defrauding a federally insured bank with the idea of defrauding its owner or directors. It is the financial institution itself—not its directors or agents—that is the victim of the fraud the statute proscribes. . . .
>
> Thus, even if [the owner of the banks] knew the true nature of the loan transactions, the institutions could nevertheless be defrauded.

36

Id. (citations omitted).  In <u>Rackley</u>, the government had produced evidence that

"defendant's interest in the particular loans was not included in the loan files,

mentioned to the board members, or discussed at board or loan committee

meetings," and the banks "would not have approved the loans or authorized the

payments at closing had the loan documents accurately reflected defendant's

interest in the loans."  <u>Id.</u> at 1362.  We concluded, therefore, that the evidence

was sufficient to support the defendant's conviction, even if the owner and

directors of the banks were aware of the fraud.  <u>Id.</u>

Likewise, in <u>United States v. Waldroop</u>, 431 F.3d 736, 742 (10th Cir.

2005), the defendant contended that there was insufficient evidence to support his

conviction for bank fraud because "he informed Mayfield [(an Executive Vice

President at the bank)] and Mayfield's secretary of his involvement with the

loans."  Again, we rejected this argument, explaining that it

> is not a defense to the charge that he colluded with Mayfield to commit bank fraud.  It is the financial institution itself—not its officers or agents—that is the victim of the fraud 18 U.S.C. § 1344 proscribes.  It follows that bank customers who collude with bank officers to defraud banks may also be held criminally accountable either as principals or as aiders and abettors.

<u>Id.</u> (citation, alterations, and internal quotation marks omitted).[13]

---

[13] The weight of authority supports our conclusions in <u>Rackley</u> and <u>Waldroop</u>.  <u>See</u> <u>United States v. Aubin</u>, 87 F.3d 141, 146 (5th Cir. 1996) ("In essence, Aubin argues that Woods' knowledge, as owner of Western Savings and Loan, should be imputed to Western, and that given the full disclosure to Woods

(continued...)

The government produced sufficient evidence of Baetz and Gallant's scheme and intent to defraud BestBank. The evidence showed that Baetz and Gallant opened a host of bogus accounts under the secured and unsecured credit card programs. They immediately made charges to these accounts, causing BestBank to transfer hundreds of millions of dollars to Century's operating account. Then, instead of purchasing delinquent and uncollectible accounts back from BestBank—as they had agreed to do—Baetz and Gallant used a number of artifices to conceal account delinquencies. These artifices included re-aging and simultaneous debits and credits on the secured accounts, and $20 credits and "paid ahead" notations on the unsecured accounts.

---

[13](...continued)
there could be no finding of an intent to defraud Western. This argument is without merit."); United States v. Molinaro, 11 F.3d 853, 857 (9th Cir. 1993) ("Mangano argues that because he fully disclosed his participation in the transactions to [the savings and loan's] authorized representatives, the government failed to prove he defrauded [it]. However, it is the financial institution itself—not its officers or agents—that is the victim of the fraud the statute proscribes." (citation, alteration, and internal quotation marks omitted)); United States v. Saks, 964 F.2d 1514, 1518 (5th Cir. 1992) (holding that the evidence was sufficient to support the defendants' convictions for bank fraud, despite the participation in the fraud by the bank officers and directors). But see United States v. Ventura, 17 F. Supp. 2d 1204, 1207-13 (D. Kan. 1998) (holding that there was insufficient evidence of a scheme or artifice to defraud, or fraudulent intent, where two bank employees testified that the defendant's conduct had been openly communicated to them), aff'd, Case No. 98-3249, 1999 WL 72037 (10th Cir. Feb. 16, 1999); but cf. United States v. Grossman, 117 F.3d 255, 259-62 (5th Cir. 1997) (holding that there was insufficient evidence of fraudulent intent to support convictions for wire fraud, because the defendant did not conceal any of the details surrounding the transaction and the transaction was not otherwise inherently illegal).

The government also introduced sufficient evidence that BestBank, as an institution, did not know or approve of the defendants' actions. For instance, Charles Wolfschlag testified that BestBank's Board of Directors was never informed of the problems with the credit card portfolios, and the Board never knew or approved of the artifices that Baetz and Gallant used to conceal delinquencies.[14] Likewise, Jon Wiedmaier's and Joseph Bour's testimony indicates that defendants' actions were not common knowledge at BestBank. Both Wiedmaier and Bour stumbled across the problem unexpectedly. Both Wiedmaier and Bour, after investigating the problem, were concerned of its potential to render BestBank insolvent. Both Wiedmaier and Bour received warnings from Boyd when they started asking questions and investigating the problem. Finally, both Wiedmaier and Bour saw their employment end—Wiedmaier, involuntarily—after bringing the problem to Boyd's attention.

Just because Boyd, Grace, and Mattar were complicit in the scheme does not mean that BestBank, as an institution, knew or approved of what Baetz and Gallant were doing. Baetz and Gallant are not absolved from bank fraud by having successfully recruited BestBank officers and directors to participate in their scheme, see Waldroop, 431 F.3d at 742; Rackley, 986 F.2d at 1361, and the

---

[14] Wolfschlag was a director of BestBank, so it is no answer—as Baetz and Gallant attempt to argue—that his duties as cashier did not involve much interaction with the credit card program.

evidence was sufficient to support their convictions under 18 U.S.C. § 1344(1).

2.      Bank Fraud (Counts 32-44): Whether the evidence was sufficient to show "executions" of the bank fraud scheme, and whether the counts were multiplicitous

Baetz and Gallant make two additional challenges to their bank fraud convictions. They first contend that "the alleged bank fraud scheme involved delinquent loan reporting," so "it could not properly have been an 'execution' of that reporting scheme for BestBank simply to have placed new loan proceeds into [Century's] operating account . . . ." Baetz Br. at 26 (emphasis omitted). Second, they contend that the bank fraud counts were multiplicitous because they did not involve separate "executions" of the bank fraud scheme.

Their first argument is unpersuasive. The indictment alleged that Baetz and Gallant "knowingly executed . . . a scheme and artifice to defraud BestBank, a financial institution," and for Counts 32-44, the indictment alleged that "[t]he scheme was executed when the following moneys, funds, credits, assets, and other property of BestBank in approximately the amounts listed [in Counts 32-44] were transferred to [Century's] operating account at BestBank." App'x at 112, 115. Contrary to Baetz and Gallant's argument, the alleged bank fraud scheme was not limited to "delinquent loan reporting." Nor was the scheme required to be. As explained above, § 1344 "was intended to reach a wide range of fraudulent activity that undermines the integrity of the federal banking system," and "[t]he phrase 'scheme or artifice to defraud' simply requires a design, plan, or ingenious

40

contrivance or device to defraud." Flanders, 491 F.3d at 1212 (citations and some internal quotation marks omitted). The government properly charged and proved the bank fraud scheme as being executed when funds were transferred to Century's operating account, and Baetz and Gallant's argument fails to the extent it argues otherwise.

Baetz and Gallant's multiplicity argument is a closer question, but in the end, the bank fraud counts were not multiplicitous. Under § 1344, "an offense occurs upon each execution or attempted execution of a scheme to defraud." United States v. Burger, 964 F.2d 1065, 1074 (10th Cir. 1992). "[A] single scheme can be executed a number of times," United States v. Longfellow, 43 F.3d 318, 323 (7th Cir. 1994), and "the question in each case is what constitutes an 'execution of the scheme,'" Molinaro, 11 F.3d at 860 (citation and some internal quotation marks omitted). The answer to this question is heavily fact-dependent, see id., and "[a] number of factors are relevant in determining whether a single or multiple executions of bank fraud have taken place, including the number of banks, the number of transactions, and the number of movements of money involved in the scheme," United States v. Brandon, 17 F.3d 409, 422 (1st Cir. 1994). "Each time an identifiable sum of money is obtained by a specific fraudulent transaction, there is likely to be a separate execution of the scheme to defraud." Id. "The central question for determining multiplicity is whether a jury could plausibly find that the actions described in the disputed counts of the

41

indictment, objectively viewed, constituted separate executions of the bank fraud scheme." United States v. Powell, Case No. 98-1111, 1999 WL 221497, at *2 (10th Cir. Apr. 16, 1999) (quoting United States v. Wall, 37 F.3d 1443, 1446 (10th Cir. 1994)).

Here, the thirteen counts of bank fraud involved separate transfers of money from BestBank to Century's operating account, and although the scheme to defraud BestBank was ongoing, these discrete transfers were what ultimately put BestBank at risk of loss. See Brandon, 17 F.3d at 422. The government appropriately charged each transfer of money into Century's operating account as a separate execution of the scheme to defraud, and the bank fraud counts were not multiplicitous. See Powell, 1999 WL 221497, at *2 ("The charged scheme called for the withdrawal of unauthorized funds from the targeted banks, using an account balance secured through the deposit of uncollectible checks. Accordingly, each withdrawal was a separate and distinct execution of the same scheme, not an integrally-related act in furtherance of a single offense.").[15]

_____

[15] Again, the weight of authority supports our conclusion. See United States v. Harris, 79 F.3d 223, 232 (2d Cir. 1996) ("In the present case, the six separate extensions of the loan agreement were chronologically and substantively independent from the initial loan agreement. . . . Accordingly, the bank fraud counts were not multiplicitous."); United States v. Mancuso, 42 F.3d 836, 847-48 (4th Cir. 1994) (explaining that the bank fraud statute "allows a separate charge for each separate diversion of funds from the financial institution in question," and holding that the defendants executed the scheme each time they successfully diverted a check from the financial institution); Wall, 37 F.3d at 1446 ("We hold

(continued...)

42

3.    Call Reports (Counts 47-54): Whether Baetz and Gallant knew the entries on the call reports were false

Baetz and Gallant next challenge their convictions under 18 U.S.C. §§ 1005 and 2, for aiding and abetting the filing of false call reports.  They argue that the evidence was insufficient because the government failed to show that they had

_____

[15](...continued)
that each loan . . . constituted a separate scheme to defraud and it was therefore not multiplicious to include those loans in separate counts.  Each loan was made entirely separately from the other and involved different borrowers, with no evident connection to each other.  Each involved a separate movement of money, and each, standing alone, put the bank at risk of loss.  The loans were not themselves related in any essential way.”); Brandon, 17 F.3d at 422 (“The government’s position is that each transaction in which Bay Loan provided a mortgage (or end loan) to a buyer on the basis of a fraudulent representation of a down payment constitutes a single, independent execution of the scheme to defraud.  We think that this position is the correct one . . . .”); United States v. Hord, 6 F.3d 276, 282 (5th Cir. 1993) (finding that “the scheme was executed with the deposit of each bogus check [into the defendant’s account], because that was the event that triggered possible instant credit being given to the account,” and because each deposit separately put the bank at risk of loss); Burger, 964 F.2d at 1074 (“Thus, each count of the Indictment involving a draw upon a line of credit would constitute a separate execution of the scheme and would be punishable as a separate crime.”).  But see United States v. Lilly, 983 F.2d 300, 303 (1st Cir. 1992) (“[A]ppellant assigned to a single bank a single package of documents that consistently misstated a single material fact in order to obtain a single loan, the proceeds of which funded a single real estate purchase.  We believe these facts are more comfortably categorized as a single execution of a scheme rather than as twenty-some-odd separate executions of a scheme.”); United States v. Heath, 970 F.2d 1397, 1402 (5th Cir. 1992) (finding one execution of a scheme to defraud one bank by procuring two loans, because “[t]he two loans . . . were integrally related; one could not have succeeded without the other”); United States v. Lemons, 941 F.2d 309, 317-18 (5th Cir. 1991) (finding one execution of a scheme to defraud, even though the defendant received the money in a series of transactions over several months, because “[t]he movement of the benefit to Lemons, although in several separate stages or acts, was only part of but one performance, one completion, one execution of that scheme”).

43

knowledge of the FDIC's "arcane instructions" or the "accounting rules that allegedly made the reports false." Baetz Br. at 29.

The evidence was sufficient to support the convictions of Baetz and Gallant for their involvement in filing the false call reports. To convict a defendant under 18 U.S.C. §§ 1005 and 2, the government must prove that "(1) defendant made a false entry in bank records, caused it to be made, or aided and abetted its entry; (2) defendant knew the entry was false when it was made; and (3) defendant intended that the entry injure or deceive a bank or public official." United States v. Wolf, 820 F.2d 1499, 1504 (9th Cir. 1987); see also Flanders, 491 F.3d at 1214. The defendant need not have made the false entries himself; as long as the defendant had the intent necessary under the statute, "it suffices that he set into motion management actions that necessarily caused [someone else] to make false entries." Wolf, 820 F.2d at 1504; see also Flanders, 491 F.3d at 1215. Under § 1005, moreover, "an omission of material information qualifies as a false entry." Flanders, 491 F.3d at 1214-15 (citation and internal quotation marks omitted). "The purpose of the statute is to ensure that 'upon an inspection of a bank, public officers and others would discover in its books of account a picture of its true condition.'" Flanders, 491 F.3d at 1214 (quoting United States v. Darby, 289 U.S. 224, 226 (1933)).

The evidence was sufficient to show that BestBank's call reports grossly understated the number of delinquencies and the adequacy of BestBank's bad debt

44

reserve. The government also introduced sufficient evidence that Baetz and Gallant were aware of BestBank's obligations to file call reports with the FDIC, and that Baetz and Gallant caused the false entries to be made—or aided and abetted their entry—by concealing the number of delinquencies in the credit card portfolio. From this evidence, a reasonable jury could have found beyond a reasonable doubt that Baetz and Gallant knew the entries on the call reports were false, and intended the entries to deceive the FDIC. See Wolf, 820 F.2d at 1504.

Baetz and Gallant's contentions on appeal border on being frivolous. Section 1005 does not require the government to prove that they had knowledge of the call report instructions or accounting rules, and the government's failure to do so is not grounds for overturning their convictions. Given the conduct of Baetz and Gallant in concealing the thousands of delinquencies in the credit card portfolio, a reasonable jury could have easily concluded that they knew—and intended—that the false information would appear on the call reports and deceive the FDIC. The government needed to show no more. The evidence was sufficient to support Baetz and Gallant's convictions under 18 U.S.C. §§ 1005 and 2.

4.    Wire Fraud (Counts 55-60, 62): Whether Baetz and Gallant committed fraud under the statute, and whether they are liable for communications preceding their involvement

Baetz and Gallant next contend that the evidence was insufficient to support their convictions for wire fraud for their involvement in the sale of Mattar's stock. They argue that they made no affirmative misrepresentations to

45

either Farrar or Cerberus, and that, at most, their conduct amounted to nondisclosure—which is not actionable as wire fraud. They also argue that the evidence was insufficient as to Counts 55 and 56, because those counts involved wire transmittals that preceded their involvement in the alleged wire fraud scheme.

The evidence was sufficient to support the wire fraud convictions on Counts 57-60 and 62, but Baetz and Gallant are correct that the evidence was insufficient as to Counts 55 and 56. To convict a defendant of wire fraud under 18 U.S.C. § 1343, the government must show "(1) a scheme or artifice to defraud or obtain property by means of false or fraudulent pretenses, representations, or promises, (2) an intent to defraud, and (3) . . . use of interstate wire or radio communications to execute the scheme." United States v. Welch, 327 F.3d 1081, 1104 (10th Cir. 2003). "A scheme to defraud focuses on the intended end result and affirmative misrepresentations are not essential; by contrast a scheme to obtain money by false pretenses, representations or promises focuses instead on the means by which the money is obtained and particular false pretenses, representations or promises must be proved." United States v. Cochran, 109 F.3d 660, 664 (10th Cir. 1997). Fraudulent intent is required under the statute, and "deceitful concealment of material facts may constitute actual fraud." Id. at 665. Although nondisclosure is not actionable as fraud absent a duty to speak, "a misleading omission is actionable as fraud if it is intended to induce a false belief

46

and resulting action to the advantage of the misleader and the disadvantage of the misled." Id. (citation, alterations, and internal quotation marks omitted). The First Circuit has explained:

> A defendant's failure to disclose information, without more, cannot make out a violation of the mail and wire fraud statutes. The authorities are less uniform on what "more" must be shown to transform a non-actionable nondisclosure into fraud in this context. Some courts have required a duty to disclose, triggered by an independent statutory scheme, the relationship between the parties, or the defendant's partial or ambiguous statements that require further disclosure in order to avoid being misleading, while others have held that withholding information with the intent to deceive is enough.

Sanchez v. Triple-S Mgmt. Corp., 492 F.3d 1, 10 (1st Cir. 2007) (citations and internal quotation marks omitted); see also United States v. Colton, 231 F.3d 890, 898-904 (4th Cir. 2000) (explaining the difference between nondisclosure and concealment, and explaining that the latter is actionable as fraud even without an independent statutory or fiduciary duty to disclose).

Baetz and Gallant's involvement in the scheme to sell Mattar's stock to Farrar and Cerberus extended beyond simple nondisclosure, and the evidence was sufficient to convict them of wire fraud on Counts 57-60 and 62. While conducting due diligence on BestBank, Farrar visited Baetz and Gallant in Florida in December 1997. Despite Farrar's questioning, Baetz and Gallant never disclosed the problems they were having with travel packages, or the $20 credits they were applying to accounts. Similarly, when Ronald Goldstein traveled to Florida to conduct due diligence for Cerberus, Baetz and Gallant never disclosed

47

the problems they were having with cardholder payments or travel packages, or the $20 credits they were applying to accounts. Most significantly, during this entire time period, Baetz and Gallant were opening bogus accounts and using $20 credits to disguise delinquencies. In this context, Baetz and Gallant's conduct went well beyond non-actionable nondisclosure and became "deceitful concealment of material facts," thus implicating Baetz and Gallant in the wire fraud scheme. Cochran, 109 F.3d at 665; see also Sanchez, 492 F.3d at 10; Colton, 231 F.3d at 898-904. There was sufficient evidence to convict Baetz and Gallant on Counts 57-60 and 62.

Counts 55 and 56 are more troubling. Those two counts involved wire transmissions sent on October 20, 1997, and December 2, 1997, respectively—before Farrar visited Baetz and Gallant in Florida. At trial, all of the government's evidence on Counts 55 and 56 involved communications between Boyd, Mattar, and Farrar. The government introduced no evidence showing that, before Farrar's visit, Baetz and Gallant were aware of the attempts to sell Mattar's stock. The evidence thus appears insufficient to show that Baetz and Gallant were knowing participants in the scheme to sell Mattar's stock—or intended to defraud potential purchasers of that stock—at the time of the wire transmissions in Counts 55 and 56. See Glazerman v. United States, 421 F.2d 547, 551-52 (10th Cir. 1970) (reversing several defendants' convictions for mail fraud on counts that occurred before they joined the scheme); cf. United States v.

48

O'Campo, 973 F.2d 1015, 1021 (1st Cir. 1992).

The government attempts to salvage Counts 55 and 56 by noting that Baetz and Gallant created Century's financial statements, which Boyd sent to Farrar before Farrar visited Baetz and Gallant in Florida. The government then points to the general rule that "so long as one participant in a fraudulent scheme causes a use of the [wires] in execution of the fraud, all other knowing participants in the scheme are legally liable for that use of the [wires]." United States v. Ward, 486 F.3d 1212, 1223 (11th Cir. 2007). There are two problems with the government's argument. First, in its brief on appeal, the government erroneously states that Boyd sent Century's financial statements to Farrar in October 1997. In actuality, the evidence presented at trial shows that Boyd sent these financial statements to Farrar in December 1997.[16] Second, and more significantly, even if Baetz and Gallant created some of Century's financial statements before October 20, 1997, the government's argument assumes that Baetz and Gallant became "knowing participants" in the scheme to sell Mattar's stock simply by virtue of their having created the false financial statements. This assumption is unsupported by any of the evidence introduced at trial, and we therefore reverse the convictions of Baetz and Gallant on Counts 55 and 56.

    5.    <u>CFCE (Count 74): Whether Baetz and Gallant each received $5 million in "gross receipts" from "a series of violations"</u>

---

[16] Indeed, one set of the financial statements appears to be the fax charged as Count 56.

Baetz and Gallant also challenge the sufficiency of the evidence as to their conviction for participating in a CFCE. They contend that they did not each receive $5 million in "gross receipts" from "a series of violations" under the statute.

The evidence was sufficient to convict Baetz and Gallant of participating in a CFCE. The CFCE statute provides:

(a) Whoever—

> (1) organizes, manages, or supervises a continuing financial crimes enterprise; and

> (2) receives $5,000,000 or more in gross receipts from such enterprise during any 24-month period,

shall be fined not more than $10,000,000 if an individual, or $20,000,000 if an organization, and imprisoned for a term of not less than 10 years and which may be life.

(b) For purposes of subsection (a), the term "continuing financial crimes enterprise" means a series of violations under section 215, 656, 657, 1005, 1006, 1007, 1014, 1032, or 1344 of this title, or section 1341 or 1343 affecting a financial institution, committed by at least 4 persons acting in concert.

18 U.S.C. § 225; see also United States v. Lefkowitz, 125 F.3d 608, 618 (8th Cir. 1997) ("The manager[, organizer, or supervisor] of a continuing financial crimes enterprise . . . violates 18 U.S.C. § 225 if (i) he supervises a series of [violations] which affect a financial institution, (ii) [he] receives at least $5,000,000 in gross receipts from the criminal enterprise in a twenty-four-month period, and (iii) [he]

acts in concert with at least three other persons in executing the crimes."). The statute includes bank fraud (18 U.S.C. § 1344), false call reports (18 U.S.C. § 1005), and wire fraud (18 U.S.C. § 1343)—but not conspiracy (18 U.S.C. § 371)—as crimes that qualify as "a series of violations." See 18 U.S.C. § 225(b).

> Count 74 of the indictment charged Baetz and Gallant with
>
> committ[ing] a series of violations charged in this indictment in Counts 2 through 44, bank fraud, . . . Counts 47 through 54, false bank reports, and Counts 55 through 73, wire fraud affecting a financial institution, which counts are incorporated into Count 74 by reference. Those violations constituted a continuing financial crimes enterprise which affected BestBank, a financial institution.

App'x at 127. The indictment also specified the requisite 24-month period as "beginning on August 1, 1996, and ending on July 23, 1998." Id.

Before the district court, the government attempted to argue that the "enterprise" specified in 18 U.S.C. § 225 "is not limited to the substantive counts of the indictment," id. at 506, and that "the enterprise consisted of both an overall scheme as well as a specified 'series of violations' that were completed as part of the execution of the scheme," id. at 508. The government concluded, therefore, that the source of the $5 million in gross receipts was not limited to the constituent violations. Rather, the $5 million in gross receipts could result from a broader criminal enterprise, with boundaries extending beyond the constituent violations specified in the statute.

The district court rejected the government's argument that the criminal

enterprise could extend beyond the constituent violations specified in the statute. In its written order, the district court also agreed with Baetz and Gallant that the bank fraud counts did not produce the requisite $5 million in gross receipts per person. The district court reasoned that, under the bank fraud scheme, the money was transferred to Century's operating account, rather than to Baetz and Gallant personally.

Nevertheless, the district court concluded that the evidence was sufficient to convict Baetz and Gallant of participating in a CFCE. The district court explained that, to be convicted under the statute, "each of the defendants must separately have received more than $5,000,000 in gross receipts from the enterprise." App'x 588-89. The district court then relied on Baetz and Gallant's convictions for the false call reports as the "series of violations" that produced the $5 million in gross receipts, reasoning:

> [W]ithout the false reporting beginning as early as 1996, the bank would have been required to close down or drastically change the credit card operations to be able to continue in the banking business. Baetz and Gallant could only continue Century operations so long as BestBank operated as a bank. . . . It follows that the defendants' receipts from Century operations were tainted by the continuing fraudulent reporting. It was not necessary for the government to trace and separate the tainted funds to prove the elements of the continuing financial enterprise charge.

Id. at 590-91. During the 24-month period defined in the indictment, moreover, "the evidence showed direct payroll payments of more than $6,000,000 to each of them . . . ." Id. at 589.

52

We agree with the district court that the evidence was sufficient to convict Baetz and Gallant of participating in a CFCE. As a preliminary matter, the district court was correct to reject the government's argument that the criminal enterprise could extend beyond the "series of violations" specified in the CFCE statute. The CFCE statute is clear that Baetz and Gallant must have "receive[d] $5,000,000 or more in gross receipts from [a continuing financial crimes enterprise]," and that a "'continuing financial crimes enterprise' means a series of violations" listed in the statute. 18 U.S.C. § 225. The scope of the "continuing financial crimes enterprise" is coextensive with the "series of violations." Cf. Harris, 79 F.3d at 230 (explaining that the defendant's receipt of $5 million "was tied to the series of violations," and "[a]ny . . . money the jury considered had to have been money obtained by [the defendant] as a result of the series of violations consisting of wire and bank fraud"). But cf. United States v. Lefkowitz, 289 F. Supp. 2d 1076, 1084-85 (D. Minn. 2003) (explaining that "the entire enterprise was a single scheme constituting the requisite series of offenses," and "the predicate offences were part of a single massive scheme to defraud and several financial institutions were affected"), aff'd, 446 F.3d 788 (8th Cir. 2006).[17]

Second, the district court was correct that the CFCE statute requires each

---

[17] The district court was also correct that the "series of violations" is limited to violations "that the jury found the defendants guilty on, and that are charged." App'x at 4576. Otherwise, there is a risk that the scope of the enterprise will be interpreted too broadly, or that the jury will return inconsistent verdicts.

defendant to receive $5 million from the enterprise. The plain language of the statute makes that clear, see 18 U.S.C. § 225(a), and in analogous situations, we have refused to attribute one set of gross receipts to two defendants simultaneously, see United States v. Weidner, 437 F.3d 1023, 1046 (10th Cir. 2006). The government may not "double-count" when attributing gross receipts to each of the defendants individually.[18]

Third, the district court correctly concluded that the series of false call reports produced at least $5 million in gross receipts to each defendant during the 24-month period. The CFCE statute lists false call reports as violations that may constitute a CFCE. See 18 U.S.C. § 225(b) (listing 18 U.S.C. § 1005). The government introduced evidence at trial, moreover, showing that Baetz and

_____

[18] It is less clear that the district court was correct in concluding that the payments to Century's operating account could not count as gross receipts. In United States v. Colton, 231 F.3d 890, 911-12 (4th Cir. 2000), the Fourth Circuit held that, for the purposes of a sentencing enhancement, money deposited into a corporate account could not constitute "gross receipts" received indirectly by the defendant, because the corporation was a separate entity and the defendant did not control the corporation. The court, however, was careful to distinguish those facts from the situation where a defendant "had a controlling stake in—if not complete ownership of—the companies receiving the illegally obtained funds." Id. at 911 (citing cases).

Here, Baetz and Gallant controlled Century, and arguably, the amounts in Century's operating account could be attributed to them as "gross receipts" for the purposes of 18 U.S.C. § 225. As the district court reasoned, though, and as we explain below, the false call reports—and the amounts personally received by Baetz and Gallant as a result of the false call reports—were sufficient to support the CFCE convictions. Thus, we need not decide whether, in this case, the money deposited into Century's operating account qualifies as "gross receipts" under 18 U.S.C. § 225.

54

Gallant each received over $6 million of payroll deposits and over $5 million of other payments from Century during the 24-month period. Without the false call reports, BestBank would have been required to close or substantially change its credit card operations, and Century would not have been able to make these payments to Baetz and Gallant. The false call reports thus constituted "a continuing financial crimes enterprise" from which Baetz and Gallant each "receive[d] $5,000,000 or more in gross receipts . . . during [the] 24-month period." 18 U.S.C. § 225.[19]

Baetz and Gallant argue that this analysis improperly includes "indirect receipts" in its calculation of gross receipts, and "[t]he false reporting counts indisputably did not directly generate any revenue." Baetz Br. at 40 (emphasis omitted). Their argument fails for two reasons. First, the term "gross receipts," while not defined for the purposes of 18 U.S.C. § 225, is defined very broadly in similar situations to include both direct and indirect receipts of money. See, e.g., 18 U.S.C. 982(a)(4) (defining "gross receipts of such an offense" to include "any property, real or personal, tangible or intangible, which is obtained, directly or indirectly, as a result of such offense"); U.S.S.G. § 2B1.1 cmt. n.11 (defining

_____

[19] This "series of violations" includes the false call reports that preceded the 24-month CFCE period (Counts 47 and 48). The CFCE statute only requires that the "gross receipts" be received during the 24-month period—not that the "series of violations" be confined to the 24-month period. See 18 U.S.C. § 225. The false call reports submitted before the 24-month period enabled BestBank to remain open, and ultimately enabled Baetz and Gallant to receive over $5 million in payments.

55

"gross receipts from the offense" to include "all property, real or personal, tangible or intangible, which is obtained directly or indirectly as a result of such offense"). Second, the CFCE statute includes § 1005 in its list of violations. See 18 U.S.C. § 225(b). If indirect receipts are not included as "gross receipts" under the CFCE statute, it is difficult to imagine how any false call reports could ever result in "gross receipts"—and at least part of § 1005 would be read out of § 225(b). We decline to restrict § 225 in such fashion, and we conclude that the evidence was sufficient to convict Baetz and Gallant under the CFCE statute.

## B.  *Jury Instructions: Whether the district court erred in denying Baetz and Gallant's request for an instruction on suretyship law*

Baetz and Gallant proposed the following jury instruction at trial:

A guarantor or indemnitor of a debt has the legal right to intervene into the contract between a debtor and creditor to pay monies to the creditor to avert both a default on the debt and the consequences to the guarantor of such a default. The guarantor's payment on a debt to avert the debtor's default is not a crime.

App'x at 367. This instruction tracked their theory of defense—i.e., that it was legal and commercially reasonable for Century to post the $20 credits because Century was obligated to indemnify BestBank for any accounts that became uncollectible. The district court refused the proposed jury instruction (and a related instruction), stating, "They are statements of the law, but I don't think they fit this, into this case." Id. at 4177.

The district court did not abuse its discretion in refusing to instruct the jury

56

as Baetz and Gallant requested. "We review de novo whether the jury instructions given were adequate, but review for an abuse of discretion the denial of [particular] defense instructions . . . ." United States v. Al-Rekabi, 454 F.3d 1113, 1121 (10th Cir. 2006); see also United States v. Williams, 403 F.3d 1188, 1195 n.7 (10th Cir. 2005). "Criminal defendants are entitled to jury instructions upon their theory of defense provided there is evidentiary and legal support. Upon the failure to so instruct, we will find reversible error." United States v. Visinaiz, 428 F.3d 1300, 1308 (10th Cir. 2005) (citations omitted). The district court, however, is not required to give a theory of the defense instruction "which lacks a reasonable legal and factual basis." Al-Rekabi, 454 F.3d at 1121 (citation and internal quotation marks omitted).

The district court was correct that the proposed jury instruction did not fit the facts of the case. Contrary to Baetz and Gallant's argument on appeal, the government did not contend that each individual credit was, somehow, inherently illegal. Rather, the government's case against Baetz and Gallant centered on the aggregate number of cardholder delinquencies and the increase in that number over time. The credits were important because they concealed the increase in the number of cardholder delinquencies—an increase that resulted, in large part, from Baetz and Gallant improperly opening, and making charges to, new accounts. Such concealment prevented BestBank's Board of Directors, the FDIC, and the purchasers of BestBank's stock from learning the true delinquency risk of the

57

portfolio. This, in turn, disguised the steadily increasing risk to BestBank's solvency, by preventing anyone from ascertaining whether the bad debt reserves could cover all uncollectible accounts. As a result, Baetz and Gallant were able to continue issuing credit cards long after BestBank had become insolvent. The proposed jury instruction was inapplicable, and it would have added nothing but confusion to the trial. See United States v. Kaatz, 705 F.2d 1237, 1246 (10th Cir. 1983) ("The instructions must be reviewed as a whole. The requested instruction would have added nothing but confusion and was properly refused." (citation omitted)).

## IV. SENTENCING

The government and all four defendants appeal aspects of the district court's sentencing procedures and conclusions. The government's primary argument is that the district court erred in calculating the amount of loss attributable to the defendants' conduct for purposes of imposing an enhancement under § 2F1.1 of the Sentencing Guidelines.[20] The defendants and the government also argue that the district court erred in imposing various other enhancements under the Guidelines. In addition, the government challenges the sentencing procedures employed by the district court and argues that the district

---

[20] The Guidelines were amended in 2001, eliminating former § 2F1.1 and combining it with § 2B1.1. All citations are to the 1997 Guidelines, which were applied by the district court with the consent of the government and all defendants. On appeal, all parties continue to agree that the 1997 Guidelines apply.

court erred in failing to order restitution.

Our standard of review is well-established: we review the district court's legal conclusions *de novo* and its factual conclusions for clear error. United States v. Todd, 515 F.3d 1128, 1135 (10th Cir. 2008). As set forth below, the district court committed legal error in calculating the Guidelines range applicable to each defendant. Because "the 'starting point and the initial benchmark' for any sentencing decision must be a correctly calculated Guidelines sentencing range," we remand with direction to vacate the sentences and resentence each defendant. Id. at 1134-35 (quoting Gall v. United States, 128 S. Ct. 586, 594-98 (2007)). In addition, because the district court erred in declining to order restitution to Taffet and Cerberus, we also reverse and remand the case for further proceedings as regards restitution not only to Taffet and Cerberus, but also to the FDIC.

On remand, the district court must "begin anew" and conduct "'fully de novo resentencing.'" United States v. Smith, 930 F.2d 1450, 1456 (10th Cir. 1991); see Todd, 515 F.3d at 1139. As a result, we need not address in depth the government's various arguments challenging the discretionary procedures employed by the district court. Nevertheless, because the record indicates that the district court may have misapplied the law or misapprehended the limits of its sentencing discretion, we provide some guidance to the district court on those issues lest they reoccur on remand.

## A. *Guidelines Calculations*

1.    Amount of Loss Under U.S.S.G. § 2F1.1(b)(1)

The government's primary argument regarding sentencing is that the district court committed procedural error in calculating the amount of loss under § 2F1.1 of the Guidelines.  Under the 1997 Guidelines, § 2F1.1(a) sets a base offense level of six for offenses involving fraud or deceit.  It is undisputed that this is the proper base offense level for the defendants' offenses.  Section 2F1.1(b)(1) provides that "[i]f the loss exceeded $2,000," the offense level should be increased depending upon the amount of loss.  No enhancement is applied if the loss is less than $2,000; a one-level enhancement is applied if the loss is greater than $2,000 but less than $5,000; and so on, with the size of the enhancement growing in relation to the amount of loss.  U.S.S.G. § 2F1.1(b)(1).  The greatest possible enhancement is eighteen, for losses exceeding $80,000,000. Id.

In calculating the amount of loss attributable to each defendant, the district court used an individualized figure pegged to the amount of money that defendant gained from his criminal conduct.  Finding that Baetz gained $11,604,179 and that Gallant gained $11,747,091, the district court assessed a fifteen-level increase for both.  Because Boyd received $4,743,909, the court assessed a thirteen-level increase for him.  Finally, the court found that Grace gained $117,643, resulting in a six-level increase.

The government contends that this calculation of loss was erroneous in two respects: it argues that, first, the district court should not have used the defendants' gain as the amount of loss without first estimating the actual or intended loss from their conduct; and second, the district court should have aggregated the amount of loss resulting from the defendants' joint conduct.[21] As set forth below, each of these points warrants reversal and remand for resentencing.

*Gain to the Defendant as the Amount of Loss*

The government contends that the district court improperly used the defendants' gains as the amount of loss. Prior to sentencing, the government presented to the district court a number of estimates of the amount of loss attributable to the defendants' conduct. It offered the court three possibilities for calculating actual loss for the bank-fraud-related counts (the details of which are unnecessary to resolving the issues presented). These computed loss at figures varying between \$65,156,797 and \$42,599,862 for the BestBank defendants and

---

[21] The government also contends that the district court did not comply with Rule 32(i)(3)(B) of the Federal Rules of Criminal Procedure, which provides that a sentencing court "must – – for any disputed portion of the presentence report or other controverted matter – – rule on the dispute or determine that a ruling is unnecessary either because the matter will not affect sentencing, or because the court will not consider the matter in sentencing." The government argues that loss was a "controverted matter" on which the district court failed to rule. The district court *did*, however, rule on loss—albeit with a methodology the government takes issue with—by using the defendants' gain as the measure of loss. This argument therefore has no merit.

61

$206,775,813 and $141,402,151 for Gallant and Baetz. The government argued that the measure of loss for the wire fraud counts was the amount of intended loss, which it calculated at $23,000,000 for all defendants from the attempt to sell BestBank stock to Cerberus Partners; $8,300,000 for the BestBank defendants from the attempt to sell BestBank stock to Frank Farrar; and $140,000,000 for Gallant and Baetz from the attempt to sell the credit card portfolio.

The defendants argued that each of these measures overinflated the amount of loss attributable to them, as at least some portion of these estimates was based upon either non-criminal conduct or events occurring after the FDIC seized BestBank, or both. They argued that arriving at an accurate measure of loss based upon the respective trial records would prove impossible, and instead proposed that the court use their gains from the scheme as the measure of loss under the Guidelines. Faced with these arguments, the government also pointed to evidence in the trial record suggesting a loss of roughly $134,000,000 resulting from the defendants' bank fraud.

The district court subsequently issued its calculation of the Guidelines range. According to the court, "[t]he amount of losses caused by the defendants cannot be calculated by any formula that fairly considers their individual roles in the offenses and the intervention by the bank regulators and the FDIC as receiver." Grace App'x Vol. IV, Doc. 1153, at 6. Thus, rather than attempting to measure the actual loss caused by the defendants' bank fraud or the intended loss

62

of their wire fraud, the district court elected to measure loss under § 2F1.1(b)(1) based upon what each defendant individually received as a result of his conduct. The court remarked that "[a]lthough there were legitimate aspects to Century's business with BestBank," the defendants' gains were "appropriate measures of loss as reasonable estimates." Id. at 7. After hearing the parties' objections, the court ultimately calculated each defendant's sentence in accordance with the gain figures set out above.

Based upon the district court's various statements, including those set forth above, it appears the court reached its loss estimates in the following manner. The evidence presented at trial showed that the actual or intended losses from the defendants' conduct were far in excess of their actual gains from that conduct. The district court agreed with the defendants, though, that the government's estimates of actual or intended loss for all counts were too high because they took into account losses that were or would have been caused not by the defendants' conduct itself, but by various other factors: default by actual cardholders, post-closure events such as the FDIC's mismanagement of the credit card portfolio, and so on.

The court, however, relying solely upon the trial records, believed itself unable to determine exactly what portion of the total losses was attributable to the

defendants' criminal actions.[22]  Faced with this dilemma, the court opted to use

the defendants' gains during the period of their participation in the criminal

conduct as the measure of loss.  By the district court's own admission, this

approach was imperfect because some of those gains were attributable to the

"legitimate aspects [of] Century's business with BestBank" and the total figures

therefore overestimated what the defendants actually gained from the criminal

aspects of their conduct.  Grace App'x Vol. IV, Doc. 1153, at 7.  However,

accepting that the defendants caused or intended additional losses beyond what

they gained from their criminal conduct, the court seized upon the total amounts

of their earnings as "reasonable estimates" of loss.  Id.  In so doing, it ran afoul of

our precedent regarding when a district court may use the defendant's gain as a

measure of loss under § 2F1.1.

As set forth in the commentary to § 2F1.1, "loss is the value of the money,

property, or services unlawfully taken."[23]  U.S.S.G. § 2F1.1 cmt. 7.  Thus,

---

[22] This is very likely because evidence to this effect, being irrelevant to the defendants' guilt or innocence, was not presented at trial.

[23] The defendants raise a meritless challenge to the government's reliance on the alternative definition put forth in Application Note 2 to U.S.S.G. § 2B1.1, which states that "'[l]oss' means the value of the property taken, damaged, or destroyed."  Application Note 7 to § 2F1.1 specifically refers the reader to § 2B1.1's commentary, and we have previously referred to the definition in Note 2 of § 2B1.1 when interpreting § 2F1.1.  See United States v. Santiago, 977 F.2d 517, 524-25 (10th Cir. 1992).  Moreover, as the government notes, the district court also used this definition, and "[n]either the court's rulings nor the government's arguments are based upon whether the property was 'damaged or

(continued...)

64

"[w]here fraud results in actual loss, that value will be used for enhancement" under § 2F1.1; "[i]f there was no actual loss or if a probable or intended loss was greater than the actual loss, the larger figure will be used." United States v. Santiago, 977 F.2d 517, 524 (10th Cir. 1992) (citations omitted). As the district court properly recognized, this definition excludes consequential damages resulting from the defendant's criminal conduct, and given the court's stated finding that the government's loss estimates were based upon consequential damages, it was appropriate for the district court to reject those figures.[24] See United States v. Izydore, 167 F.3d 213, 223 (5th Cir. 1999) (noting that "consequential losses typically are not counted when computing loss under U.S.S.G. § 2F1.1" and citing cases to that effect). The fact that all of the government's proffered figures may have been flawed, however, did not give the district court license to use the defendants' gain as an alternative measure of

---

[23](...continued)
destroyed' [versus] 'taken.'" Gov't Reply Br. (Gallant/Baetz) at 3. As a result, which definition we apply makes no difference in the present case.

[24] Although the government takes issue with this factual conclusion on appeal, it develops an argument against this conclusion only with regard to the ~$134,000,000 loss figure set forth in the so-called "Quanstrom Report." Based upon the various problems with that figure, painstakingly detailed in the defendants' briefs, the district court's finding that this figure was an inaccurate measure of loss was not clearly erroneous.

At any rate, because we ultimately remand to the district court for resentencing, it is unnecessary to address this issue in detail. The government may renew its factual arguments involving the correct loss calculation at resentencing. United States v. Galloway, 509 F.3d 1246, 1253 (10th Cir. 2007); United States v. Keifer, 198 F.3d 798, 801 (10th Cir. 1999).

loss—at least not in the way it did.

Application Note 8 to § 2F1.1 states: "The offender's gain from committing the fraud is an alternative estimate [of loss] that ordinarily will underestimate the loss." At first blush this language appears to permit the use of gain as a measure of loss without limitation. However, reading this sentence in conjunction with the rest of Application Note 8, we have previously concluded that an offender's gain may be used as an "alternative estimate" only in certain circumstances.

In United States v. Haddock, 12 F.3d 950, 960 (10th Cir. 1993), we were specifically presented with the question of "when the district court has discretion to measure loss by the defendant's gain instead of the victims' loss." The district court had used the defendant's gain as a measure of loss without considering whether the victims had suffered any loss, and if so, what the amount of that loss was. We rejected that approach. Taking note of Application Note 8's requirement that the district court "make a reasonable estimate of the loss, given the available information," U.S.S.G. § 2F1.1 cmt. 8, we remarked that "whatever the court uses to estimate the loss, the estimate must be 'reasonable,'" Haddock, 12 F.3d at 961. "If gain to the defendant does not correspond to any actual, intended, or probable loss, the defendant's gain is not a reasonable estimate of loss." Id. Calculating the actual and intended loss that resulted from each of the counts of conviction, we then reversed and remanded for resentencing after concluding that the defendant's gain overstated the amount of loss resulting from

66

his criminal conduct.  Id. at 961-64.

We recently reaffirmed this holding in United States v. Galloway, 509 F.3d 1246, 1250-53 (10th Cir. 2007), which interpreted both the 2005 Guidelines and the 1998 Guidelines.  As the latter are not materially different from the 1997 Guidelines applicable in the present case, Galloway is instructive here.  We described the district court's decision-making process:

> Faced with ever-changing and conflicting data on the loss sustained by [the victim] as well as arguments by Mr. Galloway that [the victim] sustained no loss, the district court concluded without explanation that a loss occurred, and then determined it could not reasonably quantify the actual or intended loss.  Instead, it chose to estimate the loss using Mr. Galloway's gain, the only figure not in dispute.

Id. at 1251-52.  This approach, virtually identical to the district court's approach in the present case, was soundly rejected:

> *[B]efore using gain as an alternate estimate of loss, the district court must first estimate the actual and intended loss due to a defendant's fraudulent conduct, and then consider whether the defendant's gain is a reasonable estimate of the actual or intended loss. . . .* [W]e are not suggesting that the district court must find the precise amount of loss, it must only make a reasonable estimate of the loss.  However, in doing so, the district court must make a finding that addresses the various amounts of loss proposed, especially in the case of a moving target like this one.  In this case, the proposed amounts of loss ranged from as low as $0 to as high as $122,922.29, and the district court cannot simply choose to substitute a gain of $29,359.20 as a measure of loss without a basis for why that substitution is reasonable.

Id. at 1252 (citing Haddock, 12 F.3d at 961) (emphasis added).

Haddock and Galloway control the outcome in this case.  Assuming for the

67

sake of argument that the district court correctly concluded that even the government's most modest estimates overstated the actual or intended amount of loss, the court made no attempt to calculate the actual or intended loss, or the amount by which the loss was overstated. It could have been $100; it could have been $1,000,000; it could have been $100,000,000. There is no evidence in the record that supports a conclusion that the district court's loss estimates of $11,604,179; $11,747,091; $4,743,909; and $117,643 were any more reasonable than numbers two, four, or even ten times as great as those amounts. The district court, like the district court in Galloway, simply seized upon the defendants' gain and used it as a measure of loss. As Haddock and Galloway make clear, though, this cannot satisfy the district court's responsibilities unless the court has first attempted to determine with some degree of certainty the general amount of loss, actual or intended, that is attributable to the defendants' criminal conduct and concluded that the defendants' gain "correspond[s] to" that amount. Haddock, 12 F.3d at 961. Because the district court failed to make any sort of findings regarding actual or intended loss, the record before us is not sufficient to conclude that the defendants' gain was a reasonable measure of loss. See Galloway, 609 F.3d at 1253 (concluding that where district court's findings were inadequate, it would be "premature to engage in any analysis of our own concerning the actual or intended loss").

The defendants argue that Haddock and Galloway stand for the proposition

that "[t]he defendant's gain, by itself, may not support an enhancement if there is no actual or intended loss, but *where there is loss*, it may be used as an 'alternative estimate.'" Grace Br. at 27 (quoting Haddock, 12 F.3d at 960) (emphasis in original). The defendants have misread these cases. In both Haddock and Galloway, the district court *did* find that an actual loss had occurred. The defendants' reading of Haddock and Galloway is further contradicted by the underlying rationale of both cases, which is that a defendant's gain may only be used as a measure of loss where it is a "reasonable estimate" of loss. See Galloway, 509 F.3d at 1252; Haddock, 12 F.3d at 961. Whether the defendant's gain significantly overestimates loss (as it may have in those cases) or significantly underestimates it (as it may have here), it is not a "reasonable estimate" and cannot be used to calculate an enhancement.

There is the suggestion in some of the defendants' arguments that the thing "taken" must necessarily mean the thing "taken *by the defendant*," a definition which would equate loss with the defendant's gain in every case. To the extent the defendants make this argument, it has no merit. That loss is not intended to be commensurate with the victim's gain is evident from Application Note 8 to § 2F1.1, quoted above, which states that the defendant's gain "ordinarily will underestimate the loss."

Somewhat relatedly, Boyd and Grace argue that the bonuses they received as a result of their conduct, which were the figures used by the district court to

69

calculate the loss attributable to them, constituted the legal limit of the loss they inflicted because those bonuses were the only thing directly "taken" by their fraud (rather than as a consequence of it). Both were also convicted of conspiracy, however, and as set forth in detail in the following subsection, they are also liable for the loss inflicted by the reasonably foreseeable acts of their co-conspirators. Because they therefore may be liable for losses inflicted by the conduct of Baetz and Gallant, their bonuses are not the only basis for calculating the losses attributable to their conduct.

As we cautioned in Galloway, 509 F.3d at 1252, there is no requirement that the district court calculate an amount of intended or actual loss with precision. However, Galloway and Haddock counsel that the district court should in the first instance evaluate loss from the perspective of the victim, rather than the defendant. If the district court believed that the information before it was insufficient to make a reasonable estimate of loss to the victims, the court should have requested additional evidence, such as expert testimony, from the parties. Accordingly, we must reverse and remand for a recalculation of the loss occasioned by the defendants' conduct.

*Joint v. Individual Measures of Loss for Each Defendant*

The government also contends that the district court should have aggregated the amounts of loss attributable to each defendant. It points to the district court's stated rationale for its individualized approach:

70

> While co-conspirators may be liable for the criminal acts of all those with whom they conspire, fairness in sentencing requires that some consideration be given to their individual culpability. Under the Guidelines matrix, that can be done by measuring the amount of the loss according to what each of them received.

Grace App'x Vol. IV, Doc. 1153, at 7. Based on this statement, the government argues that the district court calculated loss in a manner that is not contemplated by the Guidelines and therefore committed procedural error.

All four defendants were convicted of conspiring with one another to commit the substantive offenses for which they were also convicted. Like other offense characteristics, under Guidelines § 1B1.3(a)(1)(B) the amount of loss attributable to members of a conspiracy shall be determined on the basis of "all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity[] that occurred during the commission of the offense of conviction . . . ." United States v. Brown, 164 F.3d 518, 522 (10th Cir. 1998) (quoting U.S.S.G. § 1B1.3(a)(1)(B) (1995)) (quotation marks omitted). Thus, § 1B1.3(a)(1)(B) contemplates that a district court, in calculating the amount of loss attributable to a member of a conspiracy, will consider whether the amount of loss attributable to that member's co-conspirators resulted from "reasonably foreseeable acts and omissions" of those co-conspirators. If so, a properly-calculated Guidelines range will hold that member responsible for those losses.

The district court in the present case, rather than holding each member of the conspiracy responsible for losses resulting from the reasonably foreseeable

71

acts of his co-conspirators, instead used gain as a proxy for each defendant's culpability. The loss figures in § 2F1.1, however, calculated according to § 1B1.3(a)(1)(B), do not provide for the calculation of loss in this manner. Cf. United States v. Cutler, 520 F.3d 136, 168-69 (2d Cir. 2008) (holding that district court erred in rejecting, on the basis of the defendant's perceived culpability, a loss figure that included loss resulting from the reasonably foreseeable acts of co-conspirators; this "disregarded the principle set forth in Guidelines § 1B1.3(a)(1)(B)"). A defendant's enhancement under § 2F1.1 holds him responsible for losses caused by the reasonably foreseeable acts of his co-conspirators, with no consideration given to the degree of his culpability.

To be sure, if the district court found that certain defendants were less culpable than others, it could have taken this conclusion into account when imposing a sentence. Sections 3B1.1 and 3B1.2 of the Guidelines provide for adjustments in offense level for aggravating or mitigating roles, respectively; and the factors district courts are directed to consider under 18 U.S.C. § 3553(a) make room for differences in sentencing co-conspirators with varying degrees of culpability. Nothing in 2F1.1, 1B1.3(a)(1)(B), or the commentary to those sections, though, accounts for such considerations.

Rather than directly address the district court's failure to take into account losses occasioned by the reasonably foreseeable conduct of their co-conspirators, Boyd and Grace argue that they cannot be held liable for those losses that pre-

72

dated their entry into the conspiracy. This much is clear from the commentary to § 1B1.3, which provides that "[a] defendant's relevant conduct does not include the conduct of members of a conspiracy prior to the defendant joining the conspiracy, even if the defendant knows of that conduct . . . ." U.S.S.G. § 1B1.3 cmt. 2. To the extent that the reasonably foreseeable conduct of Boyd's and Grace's co-conspirators following their entry into the conspiracy caused losses, however, the loss attributable to them should be calculated accordingly. In addition, while Baetz and Gallant arguably may not have been responsible for the bankers' bonuses, they are, at the very least, responsible for losses resulting from one another's reasonably foreseeable conduct.

Because the district court did not include in its loss calculations those losses attributable to the reasonably foreseeable acts of the defendants' co-conspirators, we also reverse and remand this issue for resentencing.

2.    Role in the Offense Under U.S.S.G. § 3B1.1(a)

In sentencing all four defendants, the district court imposed enhancements pursuant to § 3B1.1 of the Guidelines. Gallant, Baetz, and Boyd received four-level increases under § 3B1.1(a), which allows for such increases "[i]f the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive . . . ." Grace received a three-level increase under § 3B1.1(b), which allows for such an increase "[i]f the defendant was a manager or supervisor (but not an organizer or leader) and the criminal

73

activity involved five or more participants or was otherwise extensive . . . ."

The defendants contend that the district court erred by assessing these enhancements without making a specific finding that they were organizers or leaders of at least one other person who was criminally responsible. Although not apparent from the language of the Guideline, any enhancement under § 3B1.1, including an enhancement for organizing, leading, managing, or supervising an "otherwise extensive" criminal activity, requires the involvement of at least one "participant" other than the defendant. United States v. Bauer, 995 F.2d 182, 183-84 (10th Cir. 1993); see also U.S.S.G. § 3B1.1 cmt. 2 ("To qualify for an adjustment under this section, the defendant must have been the organizer, leader, manager, or supervisor of one or more other participants."). A "participant" is "a person who is criminally responsible for the commission of the offense." Id. cmt. 1.

In preparing its preliminary calculation of the Guidelines range for the defendants, the court wrote:

> Based upon the defendant's role in the offense, the offense level is increased by 4 levels if the defendant was an organizer or leader of a criminal activity that involved 5 or more participants or was otherwise extensive . . . . The participants need not all be guilty of the crime. Many employees of Century and BestBank were required to accomplish the deception in this case.

App'x at 981-82 (citations omitted). The defendants objected to the court's proposed assessment of a four-level increase for their role in the offense, arguing

74

that the court had not identified any other criminally responsible persons they had organized or managed. Admitting that "it is true that an employee need not have been convicted to be a 'participant,'" they argued that "the employee must be proven to be criminally responsible" before a § 3B1.1 enhancement is assessed and that there was no evidence that the employees referred to by the court were criminally responsible. Id. at 989-90 (citing United States v. Aptt, 354 F.3d 1269, 1285 (10th Cir. 2004)).[25] Responding to these objections at one of the two sentencing hearings, the district court noted that "the guideline says, of course, not only the number of participants, but also for otherwise—or was otherwise extensive . . . ." Id. at 1093:10-12. It then applied the enhancements to all four defendants.

On the record before us, we agree that the district court erred in its application of the § 3B1.1(a) enhancement. "A district court must make specific findings and advance a factual basis to support an enhancement under U.S.S.G. § 3B1.1." United States v. Chisum, 502 F.3d 1237, 1242 (10th Cir. 2007) (quotation marks and citation omitted). Thus, once the defendants had raised their objection to imposition of the enhancement, the district court was required to find that they had organized or led "at least one person who was criminally responsible." Id. This is not a particularly onerous showing: "The Guideline

---

[25] Although this is the language used by Gallant and Baetz, Boyd and Grace made similar objections.

75

requires only a conclusion that [the defendant] supervised at least one such participant; it does not require the court to identify specific examples." Aptt, 354 F.3d at 1287.

Nonetheless, the district court did not make such a finding. From its statements it appears that the court may have been laboring under the misapprehension that if the defendants' activity was otherwise extensive, then there was no requirement that there be at least one criminally responsible subordinate involved in their activity. However, as the defendants correctly argue, even if a criminal activity might qualify as "otherwise extensive," this "does not eliminate the threshold requirement that a defendant supervise at least one other criminal participant." Gallant Br. at 49 (citing U.S.S.G. § 3B1.1 cmt. 2); see United States v. Cruz Camacho, 137 F.3d 1220, 1224 (10th Cir. 1998) (holding that in order to receive an enhancement under § 3B1.1, defendant must have "exercised control consistent with his leadership role over at least one other participant"). In addition, the court's statements indicate that it may have believed that the "employees of Century and BestBank" who "were required to accomplish the deception in this case" qualified as participants. App'x at 981-82. The court made no finding, though, that any of these employees were criminally responsible, and "employees who are unaware of the operation's fraudulent nature are not criminally responsible participants." Aptt, 354 F.3d at 1285. For this reason, the government's argument that the defendants' organizational control

76

over Century and/or BestBank employees qualified them for the enhancement, see Gov't Br. (Gallant/Baetz) at 69, is unpersuasive.[26]

There is ample evidence in the record to support the assessment of the four-level enhancement, and in its sentencing statements the government specifically identified other persons who may have qualified as participants.  See App'x at 423, 607.  However, "even if the record overwhelmingly supports the enhancement, appellate fact-finding cannot substitute for the district court's duty to articulate clearly the reasons for the enhancement."  Chisum, 502 F.3d at 1243 (quotation marks and citation omitted).  As a result, we remand this matter to the district court for the entry of more specific findings regarding the presence of subordinate participants in the offenses.

3.     Abuse of a Position of Trust Under U.S.S.G. § 3B1.3

The government argues that in sentencing Boyd and Grace, the district court erred by refusing to impose an enhancement under § 3B1.3 of the Guidelines, which provides a two-level increase "[i]f the defendant abused a

---

[26] Although the government does not make the argument, one could contend that there was no need for more specific findings because Gallant and Baetz were both found criminally responsible for the activity in this case, and Boyd, Grace, and Mattar were found guilty of related conduct in a separate case.  All five, the argument would run, were therefore "participants" in the offenses beyond any doubt.  However, we have previously noted that participants are "underlings or subordinates" of the defendant.  Bauer, 995 F.2d at 184 (citing United States v. Reid, 911 F.2d 1456, 1464 (10th Cir. 1990)).  The degree of control that the defendants exercised over one another's conduct is uncertain, and it would be logically inconsistent to conclude that all were "underlings or subordinates" of each other.

position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission of the offense . . . ." Boyd concedes the district court's error, while Grace argues that the enhancement does not apply to him. We agree with the government, and conclude that the district court erred by refusing to impose a § 3B1.3 enhancement.

A position of private trust is a job "characterized by professional or managerial discretion (i.e., substantial discretionary judgment that is ordinarily given considerable deference)." U.S.S.G. § 3B1.3 cmt. 1. "This adjustment may not be employed if an abuse of trust or skill is included in the base offense level or specific offense characteristic." U.S.S.G. § 3B1.3. When this enhancement "is based upon an abuse of a position of trust, it may be employed in addition to an adjustment under § 3B1.1 (Aggravating role); if this adjustment is based solely on the use of a special skill, it may not be employed in addition to an adjustment under § 3B1.1 (Aggravating Role)." Id.

In its preliminary Guidelines calculation, the district court wrote that § 3B1.3 "may not be employed if an abuse of trust is included in the determination of other specific offense characteristics and that is the case here where § 3B1.1(a) has been employed because of the positions held by these bank officers." Grace App'x Vol. IV, Doc. 1153 at 9. The government filed a written objection, arguing that a role in the offense enhancement under § 3B1.1(a) "concern[s] different aspects of a defendant's participation in the offense" than an abuse of trust

enhancement under § 3B1.3. Id. Doc. 1169 at 8. It claimed that the imposition of a role in the offense enhancement pursuant to § 3B1.1(a) only precludes a § 3B1.3 enhancement when the basis for the § 3B1.3 enhancement is the use of a special skill. The government renewed its objection at the sentencing hearing, but the court concluded that it would "stay with the calculation made as to the guidelines in the July 5th order." Grace App'x Vol. XLVI, Doc. 1208 at 44.

As noted, Boyd concedes that the district court erred in failing to apply this enhancement. Grace, however, argues that the enhancement does not apply to him.[27] We disagree. The district court was correct in noting that § 3B1.3 "may

---

[27] We do not agree with Grace that the government forfeited this issue for appellate review by failing to raise it before the district court. "A party may preserve a claim of error by informing the court—when the court ruling or order is made or sought—of the action the party wishes the court to take, or the party's objection to the court's action and the grounds for that objection." Fed. R. Crim. P. 51(b). The government noted in its written objection to the district court's initial Guidelines calculation that it believed the court's stated basis for not applying an abuse of a position of trust enhancement was erroneous, and told the court at the sentencing hearing that its argument regarding the abuse of trust enhancement was consistent with its written submission. Grace App'x Vol. XLVI, Doc. 1208 at 11. Although the government's argument at the sentencing hearing was not detailed, a party need only bring the problem to the attention of the court and make clear the action it wants the court to take; it need not repeat that objection once it has met that requirement. See Douglas v. Alabama, 380 U.S. 415, 421 (1965); Government of Virgin Islands v. Joseph, 964 F.2d 1380 (3d Cir. 1992) (objection to admissibility of hearsay statement preserved without contemporaneous objection where written motion to exclude the statement presented prior to trial and denied). Our opinions in United States v. Atencio, 476 F.3d 1099 (10th Cir. 2007), and United States v. Brown, 164 F.3d 518 (10th Cir 1998), are not to the contrary. In Atencio and Brown, the appellants *never* provided notice directly to the court that they had a particular objection; here, the government provided a detailed description of its argument to the district court.

not be employed if an abuse of trust is included in the determination of other specific offense characteristics." Grace App'x Vol. IV, Doc. 1153 at 9; <u>see</u> U.S.S.G. § 3B1.3 ("This adjustment may not be employed if an abuse of trust or skill is included in the base offense level or specific offense characteristic."). But it is well-established that an abuse of trust is not incorporated in the base offense level for fraud under § 2F1.1. <u>See</u> <u>United States v. Queen</u>, 4 F.3d 925, 928 (10th Cir. 1993) (holding that "the guideline for fraud is § 2F1.1, and it does not include any factoring for abuse of a position of trust"). The text of § 3B1.3 also makes clear that an abuse of a position of trust is not factored into a role in the offense enhancement under § 3B1.1. As the government argued in the district court,

> § 3B1.1 – aggravating role – is an adjustment to increase the offense level based on the size of the organization and the defendant's place in the hierarchy of that organization to recognize the additional culpability flowing from using larger organizations to commit crimes. In contrast, § 3B1.3 – abuse of trust – is an adjustment that looks to the manner in which the defendant's role in the offense is exercised. That is, the abuse of trust adjustment looks to the defendant's authority and discretion as factors that contributed to the commission or concealment of the criminal offense.

Grace App'x. Vol. IV, Doc. 1169 at 7-8. In electing not to assign the two-level enhancement under § 3B1.1, the district court apparently failed to recognize the distinction between a defendant's role in a larger criminal enterprise and the exploitation of a particular job or position to accomplish that crime.

Grace argues that we should affirm the district court's refusal to apply the §

3B1.3 enhancement to him because he served in a ministerial capacity and lacked the necessary managerial discretion required by the guideline. This argument amounts to a claim that Grace did not occupy a position of trust. See United States v. Spear, 491 F.3d 1150, 1153-59 (10th Cir. 2007) (discussing the issue of whether a criminal defendant had enough authority to justify a § 3B1.3 enhancement as a challenge to whether that defendant occupied a position of trust). "Whether a defendant occupied a position of trust under USSG § 3B1.3 is generally a factual matter." United States v. Haber, 251 F.3d 881, 890-91 (10th Cir. 2001). "In making this determination, the district court may consider a number of factors, including: 'the extent to which the position provides the freedom to commit a difficult-to-detect wrong, and whether an abuse could be simply or readily noticed; defendant's duties as compared to those of other employees; defendant's level of specialized knowledge; defendant's level of authority in the position; and the level of public trust.'" Id. (quoting United States v. Williams, 966 F.2d 555, 557 (10th Cir. 1992)).

We decline Grace's invitation to make a factual determination regarding whether he occupied a position of trust. The sentencing judge is in a superior position to make this factual finding, given his familiarity with the evidence and the discretionary nature of the balancing test for applying this provision in Haber. Accordingly, we remand this issue to the district court so that it may make the requisite factual findings regarding Boyd and Grace's eligibility for this

81

enhancement.

4. Substantially Jeopardizing the Safety and Soundness of a Financial Institution Under U.S.S.G. § 2F1.1

The district court imposed a sentencing enhancement against all four defendants for committing an offense that either "substantially jeopardized the safety and soundness of a financial institution" or "affected a financial institution and the defendant derived more than $1,000,000 in gross receipts from the offense." U.S.S.G. § 2F1.1(b)(6)(A)-(B). The Guidelines explain that § 2F1.1(b)(6)(A) applies when "as a consequence of the offense, the institution became insolvent; substantially reduced benefits to pensioners or insureds; was unable on demand to refund fully any deposit, payment, or investment; was so depleted of its assets as to be forced to merge with another institution in order to continue active operations; or was placed in substantial jeopardy of any of the above." U.S.S.G. § 2F1.1 cmt. 15. When this provision applies, a defendant's offense level is increased by four levels, unless, as in this case, the resulting level would be less than 24, in which case the base offense level is increased to 24. Id. Boyd, Gallant, and Baetz do not contest the imposition of this enhancement. Grace, however, argues that the court erred by imposing this enhancement without making a specific finding that he jeopardized the safety and soundness of a financial institution. We agree.

It its preliminary calculation of the Guidelines range for the defendants, the

82

court determined only that "[e]vidence at trial established that as to each defendant the offense conduct jeopardized the safety and soundness of BestBank." Grace App'x Vol. IV, Doc. 1153 at 8. The court did not specify whether the basis for the enhancement was § 2F1.1(b)(6)(A), which applies only in instances where an offense "substantially jeopardized the safety and soundness of a financial institution," or § 2F1.1(b)(6)(B), which applies when the offense "affected a financial institution and the defendant derived more than $1,000,000 in gross receipts." See Grace App'x Vol. IV, Doc. 1153 at 8. Grace's written objection to the court's imposition of this enhancement argued that the court had failed to make a specific finding that his actions had jeopardized the safety and soundness of a financial institution. See id. Doc. 1167 at 4. At the sentencing hearing, the court did not explain the basis for its initial calculation.

A district court must explain the factual and legal basis for imposing an enhancement under the guidelines. See Chisum, 502 F.3d at 1242. At a minimum, the district court had a responsibility to indicate if its enhancement of Grace's sentence was based in subsection (A) or (B) of the provision. This court cannot provide meaningful appellate review without any indication from the district court as to the basis in the Guidelines for an enhancement or the factual justification for that enhancement's imposition. See United States v. Montoan-Herrera, 351 F.3d 462, 467 (10th Cir. 2003). Thus, while there is ample evidence in the record to support the enhancement, because of the district court's

procedural shortcomings we remand this issue to the district court for the entry of more specific findings. Those findings should indicate whether the basis for the enhancement is subsection (A) or (B) of § 2F1.1(b)(6) of the Guidelines and the factual basis for the court's belief that the enhancement applies to Grace.

## B. *Sentencing Procedures*

The government argues that the district court erred in adopting—or, better said, failing to adopt—certain procedures in its sentencing. It takes issue with two of the district court's procedures in particular: (1) the decision not to have the probation office prepare a PSR, as is typically required by Rule 32 of the Federal Rules of Criminal Procedure; and (2) the decision not to hold an evidentiary hearing at which the parties would be able to introduce evidence regarding the amount of loss caused by the defendants' criminal conduct. The defendants, in turn, argue that the government did not preserve these issues for appeal by timely raising them before the district court.

We have already determined that these cases must be remanded for resentencing due to the district court's erroneous Guidelines calculations. On remand, the district court may proceed *de novo* and determine anew whether to employ these procedures. Todd, 515 F.3d at 1139; Keifer, 198 F.3d at 801. Thus, regardless of whether the government timely raised these issues before the district court in the first instance, it would be free on remand to argue that these procedures should be used and the defendants would likewise be free to argue that

84

they should not.  Because it appears that the district court's decision to forego these procedures may have been influenced by erroneous interpretations or applications of the law, we address the government's arguments to provide guidance to the district court on remand.

In concluding that it would not have the probation office prepare a PSR, the district court wrote that "the procedure directed by Fed. R. Crim. P. 32 for the conduct of an investigation and preparation of a presentence report by probation officers . . . would result in confusion and delay . . . ."  Boyd App'x, Doc. 1123, at 1.  However, Rule 32(c)(1)(A) of the Federal Rules of Criminal Procedure provides that:

> The probation officer must conduct a presentence investigation and submit a report to the court before it imposes sentence unless:
>
> > (i) 18 U.S.C. § 3593(c) or another statute requires otherwise; or
> >
> > (ii) the court finds that the information in the record enables it to meaningfully exercise its sentencing authority under 18 U.S.C. § 3553, and the court explains its finding on the record.

See also U.S.S.G. § 6A1.1 (same).  Thus, preparation of a PSR by the probation office is mandatory unless one of the two listed exceptions applies.  It is evident that the first exception, which is applicable primarily in death penalty proceedings, does not apply in the present case.  While the second exception may conceivably be applicable in this case, the district court's stated explanation for why it would not have the probation office perform a PSR—that this "would

85

result in confusion and delay"—does not conform to the requirements of Rule 32(c)(1)(A)(ii). On remand, if the district court once again elects to forego the preparation of a PSR by the probation office, it should explain on the record why it is able "to meaningfully exercise its sentencing authority" on the basis of information already in the record.

The government also contends that the district court's decision not to hold a separate evidentiary hearing at sentencing was based upon the district court's erroneous understanding of what evidence it was and was not permitted to consider under the Supreme Court's decision in United States v. Booker, 543 U.S. 220 (2005). The district court made statements at the various hearings indicating its concern about the effect of Booker on its ability to consider evidence beyond the trial record. As this court has previously explained, Booker merely prohibits district courts from applying the Guidelines in a mandatory fashion. United States v. Lawrence, 405 F.3d 888, 907 (10th Cir. 2005). Booker does not "prohibit[] the district court from making the same factual findings and applying the same enhancements" to a defendant's sentence that it would have pre-Booker. Id.; see also United States v. Magallanez, 408 F.3d 672, 685 (10th Cir. 2005) ("[W]hen a district court makes a determination of sentencing facts by a preponderance test under the now-advisory Guidelines, it is not bound by jury determinations reached through application of the more onerous reasonable doubt standard."), cert. den., 546 U.S. 955 (2005).

Therefore, the district court is free to order an evidentiary hearing on remand, should the facts warrant such a hearing under 18 U.S.C. § 3661,[28] Federal Rule of Criminal Procedure 32(i)(2),[29] and/or § 6A1.3(a) of the Sentencing Guidelines.[30] As the commentary to § 6A1.3 indicates, "[a]n evidentiary hearing may sometimes be the only way to resolve disputed issues," and if the calculation of loss for purposes of the Guidelines or restitution presents the complex factual issues that the district court understood it to, this may be such a case. See United States v. Roberts, 14 F.3d 502, 521 (10th Cir. 1993) (suggesting that, given difficulty of calculating drug quantity for Guidelines purposes, district court should hold evidentiary hearing); see also Booker, 543 U.S. at 254-55 (rejecting the argument that all sentencing facts must be proven to a jury, in part because of

---

[28] 18 U.S.C. § 3661 provides that "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence."

[29] Federal Rule of Criminal Procedure 32(i)(2) provides that the district court "may permit the parties to introduce evidence" on any objections to the PSR.

[30] The 1997 version of § 6A1.3(a), which is the same as the current version, provides that:

> When any factor important to the sentencing determination is reasonably in dispute, the parties shall be given an adequate opportunity to present information to the court regarding that factor. In resolving any dispute concerning a factor important to the sentencing determination, the court may consider relevant information without regard to its admissibility under the rules of evidence applicable at trial, provided that the information has sufficient indicia of reliability to support its probable accuracy.

the problems this would present for calculating loss in complex fraud cases).

## C.    *Restitution*

The government claims the district court erred in refusing to award restitution to Taffet, Cerberus, and the FDIC.  Under the Mandatory Victims Restitution Act ("MVRA"), sentencing courts must order restitution to victims of "offense[s] against property . . . committed by fraud or deceit."  18 U.S.C. § 3663A(a)(1) & (c)(1)(A)(ii).  A district court acting pursuant to the MVRA "shall order restitution to each victim in the full amount of each victim's losses as determined by the court without consideration of the economic circumstances of the defendant."  Id. § 3664A(f)(1)(A).  The government bears the burden of proving the amount of loss by a preponderance of the evidence.  Galloway, 509 F.3d at 1253.  The calculation of loss under § 2F1.1 of the Sentencing Guidelines does not necessarily establish loss under the MVRA.  Id.  Unlike loss under the Guidelines, the MVRA requires proof of actual loss and does not allow alternative metrics, such as gain.  See United States v. Hudson, 483 F.3d 707, 711 (10th Cir. 2007).

The district court refused to award restitution, holding that Taffet and Cerberus were not "victims" under the MVRA, and that the complexity in calculating the FDIC's losses triggered a provision of the MVRA denying restitution in cases where the burden in calculating restitution outweighs the need to compensate a particular victim.  We review the district court's application of

the MVRA *de novo*, review its factual findings for clear error, and review the amount of restitution awarded for abuse of discretion. United States v. Serawop, 505 F.3d 1112, 1117 (10th Cir. 2007).

### 1. Victims Under the MVRA

Under the MVRA, a "victim" is any "person directly and proximately harmed as a result of the commission of an offense . . . including, in the case of an offense that involves as an element a scheme, conspiracy, or pattern of criminal activity, any person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern." 18 U.S.C. § 3663A(2). The district court held that Taffet and Cerberus were not victims under the MVRA, and therefore not entitled to restitution. We disagree and reverse.

#### *David Taffet*

The government seeks restitution for Taffet based on the expenses he incurred during his effort to market the AATC credit card portfolio. It argues that he was a victim of six wire fraud counts relating to his communications with BestBank and Century regarding the financial health of the account. See Grace App'x Vol. I, Doc. 124 at 42 (describing counts 65, 68-70, and 72-73).

The jury convicted Baetz and Gallant of the six wire fraud counts, but the court later acquitted Boyd and Grace of those counts in its Rule 23(c) findings. The court refused to order Baetz and Gallant to pay restitution to Taffet based on the contrasting outcomes, saying

[a]lthough the jury was persuaded that there was a sufficiently developed and identified scheme to defraud [Taffet] through misrepresentations and omissions concerning the value of the amounts, this Court disagreed in its findings in the trial of the bank officer defendants. That uncertainty is the basis for denying compensation to him in the form of restitution as a component of a criminal sentence.

Grace App'x Vol. IV, Doc. 1153 at 10.

The district court's explanation for denying restitution to Taffet is cryptic. It is unclear what specific "uncertainty" the court references as "the basis for denying compensation." Id. The most natural reading of the court's decision suggests that inconsistency between the verdicts in the two trials on the wire fraud counts places Taffet outside the MVRA's definition of a "victim" because the government failed to sufficiently establish the existence of a "developed and identified scheme to defraud Taffet." Id. The "uncertainty" identified by the district court, however, may also refer to whether the acts of wire fraud directly caused Taffet's damages. Under either interpretation, we must reverse the district court's denial of restitution to Taffet.

Under the first interpretation, the district court's reasoning conflates the separate questions of culpability and causation. A "victim" under the MVRA is someone who is "directly harmed by the defendant's criminal conduct in the course of the scheme." 18 U.S.C. § 3663A(2). To convict Baetz and Gallant of wire fraud, the government proved beyond a reasonable doubt (1) a scheme to defraud; (2) an interstate wire communication, and (3) a purpose to use the wire

90

communication to execute the scheme. United States v. Lake, 472 F.3d 1247, 1255 (10th Cir. 2007). A guilty verdict for wire fraud, therefore, necessarily establishes the existence of a scheme to defraud, and there can be no "uncertainty" regarding whether Baetz and Gallant engaged in "a sufficiently developed and identified scheme to defraud [Taffet]." Grace App'x Vol. IV, Doc. 1153 at 10. The jury's guilty verdict established the existence of a scheme beyond a reasonable doubt, let alone by a preponderance of the evidence, and the district court erred in denying restitution based on the government's failure to prove the existence of a scheme. To the extent the district court's opinion implies that a "scheme" under the wire fraud statute differs from a "scheme" under the MVRA, it cites no authority for such a view, which in any event would seem contrary to the identical usage of the word in the two provisions.

As noted, we could also read the district court's opinion as providing an alternative basis for denying restitution to Taffet. In the sentence following its discussion of the conflicting verdicts, the court said that the MVRA "defines 'victim' as a person directly and proximately harmed by the offense and limits restitution to those 'directly harmed' by the defendant's criminal conduct in the course of a scheme or conspiracy. . . . Taffet [is not] within that definition." Id. It is possible to construe this language as indicative of the court's belief that

91

Taffet was not directly harmed by the acts of wire fraud.[31] Even interpreting the

district court's statement in such a manner, we conclude that this finding is

clearly erroneous. When Baetz and Gallant hired Taffet to market and sell the

BestBank credit card portfolio for two per cent of the sale price, their acts of wire

fraud directly led him to conclude that the credit card portfolio had no

delinquency risk. The expenses he incurred in drafting the "book" describing the

details of the portfolio for potential buyers and marketing the portfolio were

incurred because of these misrepresentations. Had Taffet known that the portfolio

was only worth about thirty per cent of its $200 million face value, he would have

known that it was unlikely he would be able to find a buyer, and likely would not

have incurred the expenses to market the account.

### *Cerberus Partners*

The district court also did not award restitution to Cerberus because

Cerberus "could only be considered a victim of the offense of securities fraud

charged in Count 90" and "[n]one of the defendants [were] convicted on that

charge." Grace App'x Vol. IV, Doc. 1153 at 10.[32] The government argues that

---

[31] This reading is admittedly strained. Given the lack of analysis on the causation question and the preceding discussion regarding the existence of a "scheme," it seems unlikely this served as the rationale for the court's refusal to award restitution.

[32] Count 90 was a securities fraud count brought pursuant to 15 U.S.C. § 77q(a) & 77x alleging that Mattar, Boyd, Grace, Baetz, and Gallant "fraudulently represented . . . to Cerberus Partners that BestBank's subprime credit card

(continued...)

Cerberus was also a victim of six wire fraud counts relating to the scheme to sell BestBank stock to Cerberus. See Grace App'x Vol. I, Doc. 124 at 42 (describing counts 58-60, and 62-64).[33] The government made this argument in its response to the district court's calculation of the advisory guidelines range, but the court never directly addressed it during sentencing.

Before we consider whether Cerberus was a victim of the wire fraud counts under the MVRA, we must address Boyd's argument that a settlement agreement between all of the defendants and Cerberus bars a restitution award to Cerberus. Boyd notes that the bankers settled with Cerberus for $60,000 and in exchange "Cerberus released [the BestBank defendants] from further liability." Boyd Br. at 79. Relying on United States v. Coleman, 997 F.2d 1101 (5th Cir. 1993), where the Fifth Circuit held that a settlement between a criminal defendant and the FDIC in a civil proceeding foreclosed the government from obtaining restitution in a criminal prosecution, Boyd argues that the settlement with Cerberus precludes restitution in favor of Cerberus. The government contends, however, that the mandatory language of the MVRA requires the court to order restitution,

_____

[32](...continued)
accounts were managed in a sound and prudent manner, that delinquency rate for the subprime account was less than five percent, that BestBank was profitable, and that Century Financial Group was performing as required[.]" Grace App'x Vol. I, Doc. 124 at 47-48.

[33] Baetz, Gallant, Boyd, and Grace were all convicted of counts 58-60 and count 62. Only Boyd and Grace were found guilty of counts 63 and 64.

93

regardless of the private settlement between the BestBank defendants and Cerberus. It notes that Coleman was not decided under the MVRA, but under the Victim Witness Protection Act, and reached that conclusion based primarily on the parsing of statutory language that does not appear in the MVRA.

We agree with the government that the settlement does not bar restitution. The MVRA requires the sentencing court to provide restitution to victims. See 18 U.S.C. § 3663A(a)(1) (noting for crimes involving fraud or deceit, "the court shall order . . . restitution to the victim of the offense . . ."). A private settlement cannot abrogate that language. See S. Rep. No. 104-179, at 18 (1995), reprinted in 1996 U.S.C.C.A.N. 924, 930 ("It is essential that the criminal justice system recognize the impact that crime has on the victim, and, to the extent possible, ensure that [the] offender be held accountable to repay these costs."). However, when determining the amount of a restitution award under the MVRA, the court must "reduce restitution by any amount the victim received as part of a civil settlement." United States v. Harmon, 156 F. App'x 674, 676 (5th Cir. 2005). This principle achieves the apparent congressional purpose of maximizing the award against a criminal defendant guilty of fraud, while avoiding the undesirable result of restitution effectuating a double recovery. Cf. United States v. Dawson, 250 F.3d 1084, 1050 (7th Cir. 2001) (citing 18 U.S.C. § 3664(f)(1)(A) for the proposition that a victim of a criminal act should not receive more in restitution than is required to make it whole); United States v. Stanley, 309 F.3d 611, 613

(9th Cir. 2002) ("The purpose of § 3664(j)(2) is to prevent double recovery by a victim . . . To prevent double recovery, payments such as those made by [the] co-defendants are subtracted from the amount of the victim's loss.").

Because the settlement does not bar an award of restitution in this case, we must consider whether the district court erred in finding that Cerberus was not a victim under the MVRA. The district court held that Cerberus "could only be considered a victim of the offense of securities fraud charged in Count 90." Grace App'x Vol. IV, Doc. 1153 at 10. Again, this language may be read in two ways, either of which is erroneous. First, it may suggest that the district court believed that Cerberus could not be a victim of wire fraud under the MVRA. To the extent the district court believed this to be the case, we disagree. An individual may qualify as a victim under the MVRA if the underlying offense is wire fraud. United States v. Foley, 508 F.3d 627, 635-36 (11th Cir. 2007); United States v. Matsumaru, 244 F.3d 1092, 1109 (9th Cir. 2001).

We can also interpret this language in another way: the district court may have recognized that Cerberus could be a victim of the wire fraud counts, but concluded that the acts of wire fraud did not cause direct harm to Cerberus. This conclusion is clearly erroneous. Baetz, Gallant, Boyd and Grace were convicted of wire fraud for the faxing of (1) the operating agreement between BestBank and Century Financial to Cerberus on April 27, 1998 (Count 58); (2) a memo from Robert Loper in New York to Mike Keys in Colorado on May 28, 1998 (Count

95

59); (3) a memorandum and data summaries from Jack Grace to Ron Goldstein at Cerberus on May 28 and 29, 1998 (Count 60); and (4) BestBank's financial statements from Colorado to Joe Khana in New York. The district court also convicted Boyd and Grace of wire fraud for the faxing of (1) Grace's memorandum with a BestBank pro forma schedule to Ron Goldstein at Cerberus on July 22, 1998 (Count 62); and (2) a Columbia Capital Corp. balance sheet and income statement from Boyd to Ron Goldstein at Cerberus on July 22, 1998.

Cerberus was harmed by at least some, and perhaps all of these acts. It would not have incurred the expenses associated with its review of BestBank's finances if not for the acts of wire fraud. The decision not to purchase a sixty per cent controlling interest in BestBank came only after Cerberus learned that the FDIC was investigating BestBank. Had BestBank provided Cerberus with accurate financial information, Cerberus's expense of performing due diligence could have been avoided.

### 2. Complexity Provision in the MVRA

The district court also refused to order restitution to the FDIC. The MVRA provides that a sentencing court need not provide a restitution award to a victim if calculating the size of that award requires "determin[ation] [of] complex issues of fact related to the cause or amount of the victim's losses" and would therefore "complicate or prolong the sentencing process to a degree that the need to provide restitution to any victim is outweighed by the burden on the sentencing process."

96

18 U.S.C. § 3663A(c)(3)(B). The district court concluded that while BestBank was a victim under the MVRA, and the FDIC as receiver assumed BestBank's right to restitution, the difficulty of calculating BestBank's losses triggered the MVRA's "complexity" exception.

In explaining its rationale for invoking the MVRA's complexity exception, the district court began by noting that the government "concede[s] that the FDIC claim is excessive" and suggested the court calculate BestBank's losses by "estimat[ing] the true value of the AATC loan portfolio." Grace App'x Vol. IV, Doc. 1153 at 11. It concluded that restitution awards "must be based on . . . actual loss" and that "[t]he approximations which may support the calculation of the amount of loss for determining the specific offense characteristic for the Sentencing Guidelines may not be used to support a restitution order." Id. at 11-12. The court then determined that additional hearings would be necessary to calculate BestBank's actual losses, and found that the time required to conduct those hearings would conflict with Federal Rule of Criminal Procedure 32(b)(1)'s requirement that "[t]he court must impose sentence without unnecessary delay." The court also noted that the FDIC could recover damages through a pending civil action. Based on these considerations, the court elected to invoke the MVRA's complexity provision and deny restitution to the FDIC.

The government objected to the district court's refusal to award restitution, arguing that existing evidence on the record provided a sufficiently precise

estimate of BestBank's loss for the court to fashion a restitution award. It also

contended that the existence of alternative litigation does not impact a district

court's duty to award restitution under the MVRA. At Baetz and Gallant's

sentencing hearing, the court rejected these arguments, saying

> the complexity in attempting to arrive at a true measure of loss in
> this case is such that . . . this case has been here for a long time [and]
> . . . the process of adjudication has taken a long time – I'm not going
> to go beyond that and beyond today. It's time to put final to this in
> this court and as to these defendants.

> So, I'm adhering to the view that I took in the July 5th order, both
> with respect to the calculation of the amount of loss or gain, and also
> the determination that there should be no order of restitution to the
> FDIC because it would – the complexity of the factual issues is such
> that it would prolong the proceedings. And, also, what the statute
> says is that the delay in the criminal proceeding is such that it would
> offset the reason for, or the need for making the victim whole. And,
> in this case, as I've already pointed out, the FDIC has a civil action
> pending.

App'x Vol. IV at 1102-03. The court did not provide any further elaboration

regarding restitution at the sentencing of Boyd and Grace.

The government argues that the district court abused its discretion in

concluding that calculating BestBank's actual loss would prove too burdensome

on the sentencing process.[34] It offers two rationales for this argument. First, the

---

[34] We do not agree with the government that the district court should have
used, as a restitution amount, either the ~$134 million figure put forth in the so-
called "Quanstrom Report" or the same figure it used as the amount of loss under
the Sentencing Guidelines. With regard to the Quanstrom Report, it was not an

(continued...)

government argues that the district court imposed an excessive burden on it by requiring it to prove the amount of BestBank's loss with precision. Second, it argues that the district court's application of the MVRA's complexity exception constitutes a clear error in judgment because the court considered the availability of a civil damages remedy in determining that the provision applies to this case. See Allen v. Sybase, Inc., 468 F.3d 642, 659 (10th Cir. 2006).

When calculating loss under the MVRA, absolute precision is not required. United States v. Ahidley, 486 F.3d 1184, 1189 (10th Cir. 2007); United States v. Teehee, 893 F.2d 271, 274 (10th Cir. 1990) (noting that "[t]he determination of an appropriate restitution amount is by nature an inexact science."). A sentencing court may resolve restitution uncertainties "with a view towards achieving

---

[34](...continued)
abuse of discretion for the district court to credit the defendants' arguments regarding its inadequacies as a measure of loss. See supra n. 24. For its Guidelines calculations, the district court measured "loss" based on the defendants' individual gains. If a court uses gain to measure loss under the guidelines, it may not use the same figure to calculate restitution under the MVRA unless the amount of gain provides a reasonable estimate of the amount of actual loss. Galloway, 509 F.3d at 1253 ("[A]lthough gain may be used to determine defendants's offense level under the Guidelines (if it more closely reflects actual harm than actual loss does), it is not an appropriate estimate of loss when determining the amount of restitution under . . . the MVRA."). The government fails to explain why the defendants' respective gains function as a reasonable estimate of the losses actually incurred by BestBank—we note that it has actually argued, in challenging the district court's calculation of the loss amount for sentencing purposes, that the defendants' gains are *not* reasonable estimates of loss—and there is no evidence on the record establishing the existence of such a relationship.

fairness to the victim," so long as it still makes a "reasonable determination of appropriate restitution" rooted in a calculation of actual loss. United States v. Vaknin, 112 F.3d 579, 587 (1st Cir. 1997) (quotation omitted). Accordingly, "in the case of fraud or theft, the loss need not be determined with precision. The court need only make a reasonable estimate of the loss, given the information available." United States v. Jackson, 155 F.3d 942, 949 n.3 (8th Cir. 1998) (quotation omitted).

On the record before this court, we are unable to say that the district court applied an erroneous "absolute precision" standard to the government's proof of loss. The court did note that a restitution order must be based on actual loss, and that "[t]he approximations which may support the calculation of the amount of loss for determining the specific offense characteristic for the Sentencing Guidelines may not be used to support a restitution order." Grace App'x Vol. IV, Doc. 1153 at 12. But there is no clear evidence, beyond the inference that may be drawn from the court's refusal to use "approximations" in calculating loss under the MVRA, that the court failed to recognize it could fashion an award based on a reasonable estimate of BestBank's actual loss. We are therefore not persuaded that this is a sufficient basis for assigning error to the district court.

The government, in its second argument, points out that in explaining its rationale for invoking the complexity provision, the district court noted the existence of a civil action commenced by the FDIC in 1998 against several of the

100

defendants.[35]  Id. at 13.  The government argues that a district court is

categorically barred from considering the existence of a pending civil suit in

determining whether to invoke the MVRA's complexity exception.  This

argument relies on 18 U.S.C. § 3664(f)(1)(B), which provides that "[i]n no case

shall the fact that a victim has received or is entitled to receive compensation with

respect to a loss from insurance or any other source be considered in determining

the amount of restitution."

We reject the government's argument because it erroneously applies the

prohibition in § 3664(f)(1)(B) to determinations regarding the complexity

exception.  In full, § 3663A(c)(3)(B)'s complexity provision provides that "if the

court finds, from facts on the record that determining complex issues of fact

related to the cause or amount of the victim's losses would complicate or prolong

the sentencing process to a degree that the need to provide restitution to any

victim is outweighed by the burden on the sentencing process," then the court is

not obliged to provide restitution under the MVRA.  18 U.S.C. § 3663A(c)(3)(B).

Section 3664(f)(1)(B), however, declares that "[i]n no case shall the fact that a

victim has received or is entitled to receive compensation with respect to a loss

from insurance or any other source be considered in determining the amount of

---

[35] Grace was not named as a defendant in the lawsuit.  Boyd reached a
settlement agreement requiring him to pay the FDIC $1,000,000 within 30 days,
but he failed to comply initially and subsequently paid only $457,000.  Grace
App'x Vol. IV, Doc. 1153 at 12.

restitution." When viewed together it becomes clear that while the complexity exception in § 3663A addresses *whether* a court must provide a restitution award to a victim, the prohibition in § 3664(f)(1)(B) relates to *how much* restitution should be awarded once the sentencing court has determined that an award is required. This is evident from § 3664(f)(1)(B)'s plain language, which provides only that a sentencing court may not consider the availability of alternative forms of relief "in determining the *amount of* restitution." (emphasis added). This language notably does not bar a sentencing court from considering the availability of other relief in determining whether any restitution award would be appropriate, *e.g.*, by stating such relief may not be considered "in determining the *availability of* restitution."

In this respect, we also note the contrast between the language of § 3664(f)(1)(B) and the language of the preceding subsection, which provides that "the court shall order restitution to each victim in the full amount of each victim's losses as determined by the court and without consideration of the economic circumstances of the defendant." Id. § 3664(f)(1)(A). Section 3664(f)(1)(A)'s language unambiguously bars a sentencing court from considering a certain factor in determining *whether* to award restitution in the first place. See United States v. Barton, 366 F.3d 1160, 1166-67 (10th Cir. 2004). Had Congress also intended to bar courts from considering the availability of alternative relief when making this threshold determination, it likely would have used similar language. This

contrasting language affirms our conclusion that § 3664(f)(1)(B) does not limit the factors that courts may consider under the complexity exception.[36]

While the availability of other relief is deemed irrelevant to the process of calculating the *amount of* a restitution award, it is not necessarily irrelevant to the *availability of* such an award under § 3663A. The existence of pending civil litigation may in some cases be relevant to the balancing test established by § 3663A(c)(3)(B)'s complexity exception. Section 3663A(c)(3)(B) directs sentencing courts to weigh the victim's need for restitution against the burden on the sentencing process. Where, as here, a civil suit has not only been commenced but has proceeded to the point where the parties have conducted extensive pre-trial motions practice, settlement negotiations, and discovery, the victim's need to rely upon the sentencing process for compensation may be lessened to some degree.

A district court should not place great weight on this factor. The mere fact that a victim has filed a civil suit, or the possibility that the victim *could* in the future file such a suit, is of little—and, typically, *no*—relevance. The section

---

[36] We acknowledge that our conclusion may conflict with that of the Ninth Circuit in United States v. Cienfuegos, 462 F.3d 1160, 1168 (9th Cir. 2006), which found that "the district court abused its discretion by relying on the perceived complexity of the restitution determination and the availability of a more suitable forum to decline to order restitution . . . ." The court's decision in Cienfuegos is somewhat ambiguous, however, and specifically notes that "under the MVRA the availability of a civil suit can no longer be considered by the district court in deciding *the amount of restitution*." Id. (emphasis added).

103

makes clear that the primary consideration is the burden that calculating restitution would place on the sentencing process. We are unpersuaded, however, that district courts are categorically prohibited from taking into account pending civil suits (and the extent to which such suits have progressed) when determining the need to provide restitution to a victim.

Here, the district court noted the complexity of calculating a restitution award based on the evidence before the court, noting that providing "a fair and just order of restitution" would be "difficult and time consuming" and expressed concern that this would conflict with its responsibility, under Federal Rule of Criminal Procedure 32(b)(1), to "impose sentence without unnecessary delay." Grace App'x Vol. IV, Doc. 1153 at 12-13. Against this burden on the sentencing process, the district court weighed the necessity of providing restitution to the victim in this particular proceeding, noting that the FDIC's ongoing civil suit, pending since October 1998, lessened this need. We find no legal error inherent in the consideration of this factor, and reject the government's argument that the district court abused its discretion by noting the availability of an alternative forum in applying § 3663A(c)(3)(B)'s balancing test.

Although the government has not identified any legal error in the district court's rulings regarding restitution to the FDIC, we nonetheless remand for further consideration the question of whether to provide a restitution award to the FDIC in light of our remand for resentencing on the question of loss. As

104

discussed above, the district court may wish to reconsider its decision not to conduct an evidentiary hearing on the question of loss, and to instead calculate loss under the Sentencing Guidelines based on the trial record. Should the district court determine that an evidentiary hearing is necessary to determine loss under the Guidelines, the added difficulty in calculating a restitution award to the FDIC will likely be reduced, and the court's application of the balancing test under the "complexity" provision would therefore change. Accordingly, on remand the district court should consider anew whether the complexity exception should apply.

## V. CONCLUSION

We AFFIRM Baetz and Gallant's convictions, except with regard to Counts 55 and 56. We REVERSE all four defendants' sentences and REMAND to the district court with direction to vacate their sentences and resentence.

Nos. 07-1344, 07-1391, *US v. Gallant*; Nos. 07-1356, 07-1391, *US v. Baetz*; Nos. 07-1407, 07-1422, *US v. Boyd*; Nos. 07-1408, 07-1423, *US v. Grace*

**TACHA**, J., concurring.

I concur fully in the judgment. I write separately because I respectfully disagree with the majority's conclusion that a district court may consider a pending civil suit in determining whether the MVRA's complexity exception applies.

The majority concludes that the subsection prohibiting consideration of "compensation . . . from insurance or any other source," 18 U.S.C. § 3664(f)(1)(B), does not apply to the court's determination of whether to deny restitution based on the complexity exception, *id.* § 3663A(c)(3)(B). To reach this conclusion, the majority emphasizes that the subsection prohibits the consideration of compensation "in determining the *amount* of restitution," § 3664(f)(1)(B) (emphasis added), but does not prohibit consideration of compensation in determining whether to deny restitution under the complexity exception. In other words, the majority interprets this subsection to apply only to the court's calculation of an actual award.

I disagree with this interpretation because I think it is inconsistent with our precedent. In *United States v. Barton*, we held that a district court may not consider a defendant's economic circumstances in determining whether to apply the complexity exception. 366 F.3d 1160, 1166 (10th Cir. 2004). We reached this conclusion based on the statutory language prohibiting consideration of a

defendant's economic circumstances: "In each order of restitution, the court shall order restitution to each victim in the *full amount* of each victim's losses as determined by the court and without consideration of the economic circumstances of the defendant." § 3664(f)(1)(A) (emphasis added).

The economic-circumstances subsection, § 3664(f)(1)(A), at issue in *Barton* immediately precedes the subsection prohibiting consideration of compensation, § 3664(f)(1)(B). Citing *Barton*, the majority notes that the economic-circumstances subsection applies when a court invokes the complexity exception, but limits the application of the compensation subsection to a court's calculation of the "amount" of an actual award. Both subsections, however, contain language concerning the "amount" of a restitution award. Thus, I do not think the plain language of the statute supports the distinction that one subsection applies only to the calculation of an actual award, while the other applies both to the calculation of an award and to the availability of an award. In short, because we held in *Barton* that a court may not consider a defendant's economic circumstances in invoking the complexity exception, I would similarly hold that a court may not consider other sources of compensation in invoking the exception.

I would therefore hold that a court may not consider compensation from a civil suit in determining whether to deny restitution under the MVRA's complexity exception. In addition, because the district court in the present case clearly considered the FDIC's pending civil suit in deciding whether to apply the

2

exception, I would hold that the court committed a legal error.